

JUDGE KAPLAN

David B. Picker, Esquire [DP-9658]
Spector Gadon & Rosen, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8888 / FAX- (215) 241-8844

David N. Mair [DM-8883]
Kaiser Saurborn & Mair, P.C.
111 Broadway
New York, NY 10006
212-338-9100



08 CV 4866

ECEIVE
MAY 2 7 2008
U.S.D.C. S.D. N.Y.
CASHIERS

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFERSON CITY COMMONS, LLC, | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : Docket No. **08 Civ.** |
| MORAN FOODS, INC. d/b/a | : |
| SAVE-A-LOT, LTD., | : |
| | : |
| Defendant. | : |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendant, Moran Foods, Inc. d/b/a Save-A-Lot, Ltd.

("Save-A-Lot"), by its undersigned attorneys, hereby Removes this case, pursuant to 28 U.S.C.

§§1332(a), 1441, and 1446, from the Supreme Court of the State of New York, County of

New York, to the United States District Court for the Southern District of New York, and in

support thereof states as follows:

1.     Plaintiff Jefferson City Commons, LLC ("Jefferson") filed this action in the

Supreme Court of the State of New York, County of New York, on May 7, 2008.

467006-1

2.    The Summons and Complaint were served upon Defendant Save-A-Lot's agent for service of process on May 7, 2008.  A copy of the Summons and Complaint is attached hereto as Exhibit "1".

3.    There have been no other proceedings in the state court action.

4.    This Notice of Removal is timely because it is filed with the Court within 30 days of service of the initial pleading or other paper setting forth a claim for relief on Defendant, as provided by 28 U.S.C. §1446(b).

5.    This Court has original jurisdiction under 28 U.S.C. §1332(a), because the claims are between citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs.

6.    Plaintiff Jefferson is a Texas limited liability company, with its principal place of business in Mineola, New York.  See Complaint, ¶¶ 1, 2; Exhibit "A" to Complaint (Lease) at §3.1.

7.    Defendant Save-A-Lot is a Missouri corporation with its principal place of business in Missouri.

8.    Upon information and belief, no member of Jefferson is a citizen of the State of Missouri.

9.    Accordingly, the parties hereto are citizens of different states, and there is complete diversity of citizenship.

10.    The Complaint seeks damages in the amount of Two Million Dollars ($2,000,000) plus interest.  See Complaint, ¶14.  Plaintiff also seeks attorneys' fees.  See Complaint, ¶15.

11.    Accordingly, the amount in controversy exceeds $75,000.

2

467006-1

12.    Because this Court would have had original jurisdiction over this matter

pursuant to 28 U.S.C. §1332(a), by reason of diversity of citizenship and an amount in

controversy exceeding $75,000, removal to this Court pursuant to 28 U.S.C. §§ 1441 and 1446

is proper.

13.    In accordance with 28 U.S.C. §1446(d), a copy of the Notice of Removal will

promptly be filed with the Clerk of the Supreme Court of the State of New York, County of

New York, and served on counsel for Plaintiff.

WHEREFORE, Defendant Moran Foods, Inc. d/b/a Save-A-Lot, Ltd. respectfully

requests that this action be removed to this Court for all purposes.

Date:  May 27, 2008
       Philadelphia, PA

Respectfully submitted,

**SPECTOR GADON & ROSEN, PC**

By: David Picker

David B. Picker, Esquire [DP-9658]
1635 Market Street, 7th Floor
Philadelphia, PA  19103
215-241-8888 / 215-241-8844 (fax)

David Mair, Esquire
KAISER SAURBORN & MAIR, PC
111 Broadway
New York, NY  10006
212-338-9100
*Attorneys for Defendant*

3

467006-1

# Exhibit 1

*SUPREME COURT OF THE STATE OF NEW YORK*
*COUNTY OF NEW YORK*

_____

JEFFERSON CITY COMMONS, LLC

                 Plaintiff,

-against-

MORAN FOODS, INC. d/b/a SAVE-A-LOT, LTD.,

                 Defendant.

_____

Index No.  60379|08
Date Purchased  5-7-08
Plaintiff(s) designate(s)
*NEW YORK*
County as the place of trial.

The basis of venue is
Defendant's address

*SUMMONS*
Plaintiff(s) reside at
48 East Old Country Road
Mineola, New York 11501

County of Nassau

To the above named Defendant(s):

    *You are hereby summoned* to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's Attorney(s) within twenty days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
      May 7, 2008

JAROSLAWICZ & JAROS, LLC
Attorneys for Plaintiff
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780

By: _____
          David Jaroslawicz

Defendant(s) address(es):

MORAN FOODS, INC.
d/b/a SAVE-A-LOT, LTD.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10019

NEW YORK
COUNTY CLERK'S OFFICE

MAY 07 2008

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------x

JEFFERSON CITY COMMONS, LLC

Index No. $60137908$

Plaintiff,

VERIFIED COMPLAINT

-against-

MORAN FOODS, INC. d/b/a SAVE-A-LOT, LTD.,

Defendant.

------------------------------------------------------------------------x

Plaintiff, by its attorneys, Jaroslawicz & Jaros, complaining of the defendants, upon information and belief, alleges as follows:

## THE PARTIES

1.     At all times hereinafter mentioned, plaintiff is a Texas limited liability company.

2.     At all times hereinafter mentioned, plaintiff has offices in New York.

3.     At all times hereinafter mentioned, the plaintiff owned the premises known as Jefferson City Shopping Center, located at 3513 Twin City Highway, Port Arthur, Texas.

4.     At all times hereinafter mentioned, the defendant Moran Foods, Inc. is a foreign corporation, duly organized and existing under and by virtue of the laws of the State of Missouri.

5.     At all times hereinafter mentioned, the defendant has designated New York County as its County.

6.     At all times hereinafter mentioned, the defendant does business as Save-A-Lot< Ltd.

## THE UNDERLYING FACTS

7.      The parties entered into a lease agreement dated July 10, 2007 with respect to the aforementioned premises whereby plaintiff would lease a store to the defendant to be known as Store #713 at the aforementioned location; a copy of the lease is annexed hereto as Exhibit A and incorporated herein.

8.      After plaintiff had expended substantial funds to prepare the premises for the defendant, the defendant fabricated a reason not to move into the premises, in violation of the terms of the lease (Exhibit B).

9.      The reason provided for terminating the lease was a pretext; the defendant made a corporate decision to close several stores in that part of Texas.

10.     Thereafter, the defendant was notified that it would be held responsible for damages under the lease.

## AS AND FOR A FIRST CAUSE OF ACTION

11.     Pursuant to the terms of the lease, ¶3.2, defendant is responsible for the rent up to and through at least seven years.

12.     By reason of the foregoing, defendant is liable to the plaintiff for a base rent and additional rents.

13.     The defendant has breached its agreement with the plaintiff.

14.     By reason of the foregoing, defendant is liable to the plaintiff in the amount of Two Million Dollars ($2,000,000) plus costs and interest for the breach of the lease agreement.

15.     Defendant is also liable to the plaintiff for costs and attorneys' fees.

2

16.     By reason of the foregoing, plaintiff is entitled to recover all of his damages from the

defendant.

WHEREFORE, plaintiff demands judgment against the defendant, to recover for all of its

damages, all together with the costs and disbursements of this action.

JAROSLAWICZ & JAROS, LLC
Attorneys for Plaintiff
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780

By: _____
        David Jaroslawicz

3

DAVID JAROSLAWICZ, a member of the firm of JAROSLAWICZ & JAROS, attorneys for the plaintiff(s) in the within action, duly admitted to practice in the Courts of the State of New York, affirms the following statements to be true under the penalties of perjury, pursuant to Rule 2016 of the CPLR:

That he has read the foregoing Complaint and knows the contents thereof; that the same is true to his own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters, he believes them to be true.

Affiant further states that the source of his information and the grounds of his belief are derived from the file maintained in the normal course of business of the attorneys for the plaintiff(s).

Affiant further states that the reason this affirmation is not made by the plaintiff(s) is that at the time this document was being prepared, the plaintiff(s) was (were) not within the County of New York, which is the County where the attorney for the plaintiff(s) herein maintains his office.

Dated: New York, New York
       May 7, 2008

DAVID JAROSLAWICZ

# EXHIBIT A

# SHOPPING CENTER LEASE

*Jefferson City Shopping Center*
*Port Arthur, Texas*

between

## JEFFERSON CITY COMMONS, LLC, as Lessor

and

## MORAN FOODS, INC., as Lessee

Dated July 18th., 2007

# LEASE

## Jefferson City Shopping Center
## 3513 Twin City Highway, Suite 22
## Port Arthur, TX

THIS LEASE is made on the $\underline{\hspace{0.8cm}}$ day of $\underline{\hspace{1.5cm}}$, 2007, between JEFFERSON CITY COMMONS, LLC, a Texas limited liability company ("Lessor"), and MORAN FOODS, INC., a Missouri corporation, d/b/a Save-A-Lot, Ltd. ("Lessee").

### ARTICLE 1. PREMISES

Section 1.1  Leased Premises and Shopping Center.  In consideration of the mutual covenants and agreements herein contained, Lessor hereby leases to Lessee the land and improvements existing thereon, or to be constructed thereon as hereinafter provided, situated in the Jefferson City Shopping Center at 3513 Twin City Highway, Suite 22, in the City of Port Arthur, County of Jefferson, and State of Texas, and outlined in red on Exhibit A hereto attached, consisting of a portion of a building approximately 19,141 square feet (hereinafter referred to as the "Leased Premises"), together with all appurtenances and the rights granted with respect to the Common Facilities (as hereinafter defined).  The entire tract of land shown outlined in blue on Exhibit A, of which the Leased Premises is a part, together with any additions thereto and all improvements existing or constructed thereon are hereinafter referred to as the "Shopping Center".  The Shopping Center is legally described on Exhibit AA hereto attached.

### ARTICLE 2. TERM

Section 2.1  Original Term.  The term and Lessee's obligation to pay base rent and additional rent herein shall begin on the earlier of (i) the day Lessee opens for business with the public in the Leased Premises, or (ii) the one hundred twentieth (120th) day following the acceptance by Lessee of possession of the Leased Premises as provided for in Article 4 hereof (the "Commencement Date").  The term shall end on the last day of the seventh (7th) lease year. Within sixty (60) days after the beginning of the term, Lessee shall certify the beginning and ending dates of the term in a letter to Lessor.

Section 2.2  Options.  Lessee shall have the option to extend this Lease for three (3) successive extension terms of five (5) full lease years each, subject to the terms, covenants and provisions of this Lease.  Lessee may exercise each said option by giving Lessor written notice thereof no less than one hundred eighty (180) days prior to the beginning of each such period of extension.  The word "term" whenever used herein shall mean the original term and any extensions thereof unless the context otherwise requires.

Section 2.3  Lease Year.  The term "lease year" shall mean a period of twelve (12) consecutive months.  The first lease year shall begin on the date of the beginning of the term if such date occurs on the first day of a month; if not, then on the first day of the first month succeeding the beginning of the term.  Subsequent lease years shall run consecutively, each beginning on the first day of the month succeeding the completion of the previous lease year.

### ARTICLE 3. RENT

Section 3.1  Rent Payee.  Rent checks shall be made payable to Lessor and rent checks shall be mailed to 48 East Old Country #203, Mineola, NY 11501 until Lessee is otherwise notified

in writing by Lessor at least ten (10) days prior to the rent payment date on which the change in payee is to be effective. In the event that the Lessor's interest in this Lease shall pass or devolve upon another, or in the event that one other than the Lessor or the designated rent payee shall become entitled to collect the rent, then in any such event notice of the fact shall be given to the Lessee by the Lessor; or, if the Lessor is an individual and shall have died or become incapacitated, by the Lessor's executors, administrators or legal representatives, together with due proof of the status of such executors, administrators or legal representatives, and until such notice and proof the Lessee may continue to pay rent to the one to whom the last preceding installment of rent was paid and each such payment shall to the extent thereof fully exonerate Lessee. Notwithstanding the foregoing, (i) Lessee may, but in the absence of notice and proof given as above provided shall be under no obligation to pay rent to such one other than the Lessor, or the designated rent payee, who may become legally entitled to receive such rent; and (ii) Lessee shall be fully protected in acting upon any notice purporting to be signed by or on behalf of the one who should give such notice and believed by Lessee in good faith to be genuine.

Section 3.2    Base Rent.

A.    Lessee shall pay as base rent throughout the initial term the sum of EIGHTY-SIX THOUSAND ONE HUNDRED THRITY-FIVE AND 50/100 DOLLARS ($86,135.50) per lease year which shall be paid in equal installments of one-twelfth (1/12th) of said sum on or before the first day of each month of the initial term.

B.    Lessee shall pay as base rent the sum of NINETY-FIVE THOUSAND SEVEN HUNDRED FIVE AND NO/100 DOLLARS ($95,705.00) per lease year which shall be paid in equal installments of one-twelfth (1/12th) of said sum on or before the first day of each month of the first extension term, if exercised by Lessee.

C.    Lessee shall pay as base rent the sum of ONE HUNDRED FIVE THOUSAND TWO HUNDRED SEVENTY-FIVE AND 50/100 DOLLARS ($105,275.50) per lease year which shall be paid in equal installments of one-twelfth (1/12th) of said sum on or before the first day of each month of the second extension term, if exercised by Lessee.

D.    Lessee shall pay as base rent the sum of ONE HUNDRED FOURTEEN THOUSAND EIGHT HUNDRED FORTY-SIX AND NO/100 DOLLARS ($114,846.00) per lease year which shall be paid in equal installments of one-twelfth (1/12th) of said sum on or before the first day of each month of the third extension term, if exercised by Lessee.

Section 3.3    Pro Rata Base Rent.  Rent shall be reduced pro rata for any part of the lease year less than a full lease year and Lessee shall pay rent pro rata for that part, if any, of the term preceding the first lease year.

## ARTICLE 4. IMPROVEMENTS

Section 4.1    Leased Premises Improvements.  The Leased Premises are improved as a portion of an existing retail store building (hereinafter the "Building"). Lessor shall, at its expense, complete the work on Exhibit B (hereinafter referred to as the "LP Work"), which work shall be done in a lien-free, good and workmanlike manner, in compliance with all applicable codes and governmental requirements and in accordance with the specifications attached hereto as Exhibit B.

Page 2

Section 4.2    Shopping Center. Lessor covenants that all buildings in the Shopping Center shall be located wholly within the areas designated therefor on Exhibit A and that no building in the Shopping Center, including any rooftop equipment, shall be taller than one story or a maximum of 18 feet. The sidewalks, driveways, alleys, landscaping, parking areas, service areas, including loading and unloading facilities, utilities to the point where they enter a building, Shopping Center signs and mall, if any, and other facilities of the Shopping Center designed for use by all occupants of the Shopping Center, including all easements, accesses or other rights benefiting the Shopping Center (even if not located on the Shopping Center) are herein together referred to as the "Common Facilities".

Section 4.3    Timing. Lessor further agrees to complete the LP Work, and deliver actual exclusive possession of the Leased Premises to Lessee on or before the ninetieth (90th) day from the date of this Lease. Lessee agrees to accept possession of the Leased Premises upon completion of the LP Work. In no event shall the LP Work be deemed completed unless Lessor has furnished Lessee with a certificate of occupancy or certificate of completion, if one is available, upon completion of the LP Work and other permits necessary for Lessee's use of the Leased Premises except Lessee's business licenses. If Lessor fails to complete the LP Work and tender actual exclusive possession of the Leased Premises to Lessee by said date and such failure continues for five (5) days after written notice of the failure by Lessee to Lessor, Lessee may, at its option, complete all or a portion of the LP Work and deduct the reasonable costs incurred from all rent and other charges due under this Lease. If Lessor fails to complete the LP Work and tender actual exclusive possession of the Leased Premises to Lessee by said date and such failure continues for sixty (60) days after written notice of the failure by Lessee to Lessor, Lessee may, at its option, immediately cancel this Lease by notice in writing to Lessor, except for reasons which are beyond the reasonable control of Lessor as described below. The date for completing the LP Work shall be deferred for a period equal to any delay caused by reason of labor controversy, act of God, fire or other casualty, governmental regulations or other cause beyond the reasonable control of Lessor, provided Lessor has from time to time in writing kept Lessee fully advised of such delays and the cause thereof. Notwithstanding any delays, whether within or beyond the control of Lessor, if the LP Work has not been completed, the existing Farmer's Furniture lease terminated and actual exclusive possession of the Leased Premises tendered to Lessee on or before the date six (6) months from the date hereof, Lessee may cancel this Lease by notice in writing to Lessor given at any time thereafter prior to such completion and tender.

Section 4.4    Change Orders Lessee may issue written change orders for the plans for the LP Work using the procedures provided herein. Lessee shall provide written notice to Lessor of a proposed change order. Within ten (10) days thereafter, Lessor shall provide written notice of the reasonable net, out-of-pocket costs incurred by Lessor as a result of the change order and any reasonable extension to the deadline for completion of the LP Work provided in Section 4.3 that would be reasonably required as a result of implementing the change order. The change order shall not be effective until Lessee has delivered to Lessor written notice of its acceptance of the costs and time delay specified by the Lessor for implementing the change order.

Section 4.5    Lessee's Permit Contingency. If Lessee is denied any building permit or other governmental approval, including without limitation a certificate of occupancy or certificate of completion, necessary to permit Lessee to make improvements to the Leased Premises that Lessee deems necessary to operate a retail food store and/or general merchandise store therein, then Lessee may cancel this Lease by notice in writing given to Lessor within ninety (90) days of the Execution Date.

Section 4.6   Fixturing.   Prior to completion of the LP Work and tender of actual exclusive possession of the Leased Premises to Lessee, Lessee may at its own risk enter upon the Leased Premises at such times as it deems appropriate to inspect the LP Work, make improvements thereon, install fixtures and other equipment, erect signs and stock merchandise and supplies, all without unreasonably interfering with the progress of the LP Work, and such acts by Lessee shall not be construed as acceptance of the Leased Premises by Lessee.

## ARTICLE 5. MAINTENANCE, REPAIRS AND UTILITIES

Section 5.1   Lessee's Obligations.   With respect to the improvements on the Leased Premises, Lessee agrees, at its sole expense, to:

(a)   Make all repairs necessitated by the negligence or intentional acts of Lessee, its agents, contractors and employees;

(b)   To the extent not covered by warranty, provide ordinary maintenance of the heating, air-conditioning and air cooling equipment and make minor replacements and repairs incidental thereto (for the purposes hereof, incidents of repair and/or replacement costing less than $1,500.00 per incident shall be deemed "minor"). Lessee shall obtain and maintain in full force and effect a standard maintenance service contract on the heating, air-conditioning and air-cooling equipment serving the Leased Premises;

(c)   Pay for all water, fuel, gas, electricity and other utilities used by it, as measured by separate meters to be provided by Lessor (at its sole cost and expense);

(d)   Replace all plate glass or doors broken or damaged not required to be replaced by the Lessor; and

(e)   Perform other routine maintenance of the interior of the Leased Premises not required to be made by Lessor;

except that any repairs, replacements or restorations made necessary by reason of fire or other casualty shall be completed in accordance with the terms of Article 7.

Section 5.2   Lessor's Obligations.   Lessor agrees, at its sole expense, to:

(a)   Make all necessary repairs and provide maintenance to the exterior portions and structural portions of the Building, including but not limited to roofs, foundations, gutters, structural walls and canopies, but excluding exterior doors and Lessee's signs; and to repaint all exterior painted portions of the Building when necessary but in no event less than once every five (5) years in such color(s) as Lessee designates;

(b)   To the extent not covered by warranty, make all necessary repairs and replacements of the heating, air-conditioning and air cooling equipment serving the Building not required to be made by Lessee;

(c)   Provide adequate connections with the local water supply, sewerage systems, gas, electrical and other utilities; maintain all said systems and lines to the point where they enter the Building and provide separate meters for measuring Lessee's use;

Page 4

(d)     Replace all plate glass or doors broken or damaged prior to the delivery of the Leased Premises to Lessee; and

(e)     Make all alterations, repairs and replacements, interior and exterior, to the Building when necessary as a result of faulty construction or Lessor's failure to promptly discharge its obligations under subsections (a), (b), (c) or (d) hereof.

Section 5.3     Warranties.  Lessor shall assign or cause its beneficiaries to assign to Lessee any claims against any contractor, supplier or other person for breach of contract or warranty relating to any construction, remodeling, alteration or reconstruction of the Building insofar as Lessee is herein obligated to maintain, repair or replace same and shall permit Lessee in its discretion and at its expense to take legal action against such person or persons in the name of Lessor.  Lessor shall cooperate fully with Lessee in asserting any such claim, and if any damages or other payments are received by Lessor as a result of such claim, Lessor shall pay the same over to Lessee.

Section 5.4     Common Facilities.  Lessor shall maintain the Common Facilities in good order, appearance and repair in a manner typically provided for in a shopping center comparable to the Shopping Center (including but not limited to all necessary patching, resurfacing and restriping of the parking areas), provide adequate lighting thereof, and promptly remove all snow, dirt and debris therefrom.

Section 5.5     Fees.  Lessor shall pay all permit and inspection fees relating to the Leased Premises or the Shopping Center (including without limitation driveway fees) imposed by governmental authorities, except fees relating to Lessee's business, improvements and signs.

Section 5.6     Performance.  All maintenance, alterations, repairs and replacements shall be begun and completed within a reasonable time.  Any of such work to be performed by Lessor shall be done so as to reasonably minimize inconvenience to the operation of the Lessee's business on the Leased Premises.

Section 5.7     Lessor's Representations.  Lessor represents and warrants to Lessee that as of the beginning of the term of this Lease, (a) there is no material adverse fact relating to the physical condition of the Common Facilities or the Building which has not been disclosed in writing to Lessee; (b) all HVAC and other equipment associated with the Building shall be in good working order; and (c) it has no knowledge of any proposed plans for the widening of any street adjacent to the Shopping Center or for any other public projects or public works affecting the Shopping Center.

## ARTICLE 6.  USE, COMMON FACILITIES, ALTERATIONS AND FIXTURES

Section 6.1     Use.  The Leased Premises may be used for a grocery store, supermarket, or limited assortment food store selling food/grocery items and general merchandise (at a single price point or otherwise), and any other uses that may be incidental to such a grocery store, supermarket, or limited assortment food store from time to time (such as, but not limited to, video department or pharmacy department), or otherwise generally deal in any and all articles of food, food products, grocery products, household products and general merchandise (at a single price point or otherwise), including the sale or rental of such products and services as may be sold or rented from time to time by such a grocery store, supermarket, or limited assortment food store (the "Intended Use").  The Leased Premises may also be used for any other lawful purpose, provided such use does not violate the exclusive use of another tenant in

Page 5

the Shopping Center set forth on Exhibit E (unless such restriction has expired under the terms of such tenant's existing lease or due to the termination or expiration of such tenant's existing lease).

Lessor hereby grants to Lessee, its employees and invitees, without charge: (a) the right to use in common with the other tenants and occupants of the Shopping Center and their respective employees and invitees, all of the Common Facilities, including the express grant to Lessee of the right and authority, at Lessee's sole discretion, to police the Common Facilities to prevent or cause to be removed from the Common Facilities persons engaging in solicitation, distribution, picketing, petitioning, hand billing or any other activity which Lessee believes could create a disturbance, deter customers, threaten safety, impede or interfere with the business operations of Lessee or the smooth flow and free passage of employees and invitees to the Leased Premises, provided that Lessee shall not be obligated to take, and shall have no liability for not taking, any action against such persons; and (b) the exclusive right to use (i) that portion of the service areas designed for use with the Leased Premises, including any loading and unloading facilities; and (ii) reasonable portions of the sidewalks and parking lot adjacent to the Leased Premises for storage of shopping carts and the display and sale of merchandise.

Section 6.2    Use of Common Facilities.  Lessor agrees that (a) the Common Facilities shall be maintained by Lessor solely for the convenience and use of Lessee and the other tenants and occupants of the Shopping Center and their respective employees and invitees, and it shall not grant any rights with respect to the Common Facilities or permit the use thereof by any persons other than the tenants and occupants of the Shopping Center, their employees and invitees; (b) it shall provide all of the Common Facilities for such use at all times, except during reasonable periods of time required to provide necessary maintenance or repairs; (c) it shall not change the Common Facilities located within the "No-Build Area" shown cross-hatched on Exhibit A in any manner without the prior written consent of Lessee; provided such building does not exceed 2,400 square feet in size or 18 feet [including rooftop equipment] in height), and (d) it shall require all tenants and occupants of the Shopping Center and their employees to park their automobiles in a portion of the parking area reasonably designated for such purpose, which area shall be located in the part of the Shopping Center least likely to be used by the customers of Lessee and other tenants and occupants of the Shopping Center.  Lessor may build other structures on the parking lot located outside of the No-Build Area, so long as such structures are legal and do not materially block the view or access to the Leased Premises.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, LESSEE SHALL NOT HAVE ANY OBLIGATION, EXPRESS OR IMPLIED, TO OPEN ANY BUSINESS AT THE LEASED PREMISES, TO REMAIN OPEN FOR BUSINESS IN THE EVENT A BUSINESS IS OPENED AT THE LEASED PREMISES, TO REOPEN FOR BUSINESS IN THE EVENT A BUSINESS IS OPENED AT THE LEASED PREMISES AND THEN CLOSES, OR OTHERWISE TO CONDUCT ANY BUSINESS AT THE LEASED PREMISES.

Section 6.3    Use Restrictions.  Lessor agrees that no portion of the Shopping Center, except for the Leased Premises as to Section 6.3(a), shall be used or operated:

(a)    as a supermarket or other store, or department within a store, for the sale of food, groceries, fruit, produce, dairy products, vegetables, bakery products, or meats; or

(b)    as an adult bookstore, massage parlor, or any other establishment which provides live adult entertainment or which sells, rents or exhibits pornographic or obscene materials, as an abortion clinic, flea market, or vehicle sales; or

Page 6

(c)    within two hundred fifty (250) feet of the Leased Premises as a nightclub (not including establishments with live music and dancing which operate primarily as restaurants) or discotheque, off-track betting business or store selling strictly firearms or ammunition.

(d)    Further, no portion of the Shopping Center located to between and including the premises numbered twenty-three (23) and seventeen (17) on Exhibit A shall be used or operated as a movie theatre, tire store and service facility with service bays, or so-called "call center".

The restrictions in Section 6.3(a) shall not apply to (i) the following existing tenants (their successors and assigns; provided that Lessor agrees to withhold its consent to any assignment, sublease or change in use, which would conflict with the exclusive use granted to Lessee herein, except existing use): Port Arthur Bingo, Dollar General, Citi Trends, Ramirez Imports, Texas State Optical, Naomi Fashions, Moon Palace, Sav-On Office Supplies, One Stop Beauty, Beauty Salon, Sarah's Bakery, Rainbow Apparel, Sun Loan Company, Side Pocket, Affordable Furniture, Colors for Men, Dollar Supreme, Biomat USA, Inc., Burke's Outlet, La Morenita Meat Market, Radio Shack, EZ Pawn, Texas State Bank, Burger King, Paradise Café, Ice Cream Store, for so long as such tenant is operating in its existing premises under its existing lease and for the purposes already permitted in its existing lease; (ii) restaurants (including fast food restaurants, delicatessens, eat in restaurants and take out restaurants) from selling prepared foods for on and off premises consumption; (iii) discount general merchandise stores such as, but not limited to, stores such as Family Dollar, Dollar Tree and Big Lots; provided that not more than 150 linear feet of total shelving area (including coolers and freezers) shall be used for the sale/display of food items for off-premises consumption and not more than two 4-foot coolers and one 4-foot freezer for the sale/display of food items for off-premises consumption; or (iv) the selling of food items as incidental to a tenant's primary use. For purposes hereof, the term "incidental" shall mean that not more than ten (10) linear feet of total shelving area may be devoted to the sale/display of food items. Notwithstanding the foregoing, in no event shall any portion of the Shopping Center (except for the Leased Premises and the existing La Morenita Meat Market, its successors and assigns, for so long as such La Morenita Meat Market (or its successors/assigns) is operating in its existing premises under its existing lease and for the purposes already permitted in its existing lease) be used for the sale or display of fresh fruit and produce, fresh butchered or case-ready meat, poultry or fish products.

In the event of breach of any restrictions contained within this Section, then all rents and other charges to be paid by Lessee under this Lease shall abate by fifty percent (50%) until such violation is corrected. If such violation continues for a continuous period of one hundred eighty (180) days after Lessee sends written notice to Lessor of such violation, Lessee may terminate this Lease by sending Lessor an additional written notice at any time after said 180-day period while said violation continues. Lessee shall also be entitled to seek injunctive relief, in addition to any other rights or remedies available to Lessee pursuant to applicable law or this Lease.

Section 6.4    Zoning.   Lessor warrants that there is no zoning law, ordinance or regulation prohibiting the use of the Leased Premises for the Intended Use (defined in Section 6.1), nor prohibiting the use of the Common Facilities for accessory automobile parking, signs, and service facilities as herein permitted or required. If any such existing or future zoning law, ordinance or regulation is enforced so as to prohibit such use of the Leased Premises or Common Facilities, Lessee may cancel this Lease by giving Lessor not less than ten (10) days' written notice.

Section 6.5 Deliveries. If at any time the access by semi-trailer trucks (with 58' trailers) or other delivery vehicles to or from the service doors of the Building and the adjacent streets and alleys is prevented or materially impeded for any reason beyond Lessee's reasonable control and as a result thereof Lessee discontinues or is prevented from conducting a retail business in the Leased Premises, then all rents and other charges to be paid by Lessee under this Lease shall abate until such access is again permitted. If such access preclusion continues for a period of thirty (30) days, Lessee may terminate this Lease by notice in writing to Lessor at any time thereafter while said condition continues.

Section 6.6 Private Restrictions. Lessor covenants that Lessee will not be prevented from or restricted in using the Leased Premises for the Intended Use (defined in Section 6.1) or in rendering any services on the Leased Premises nor in exercising the rights herein granted with respect to the Common Facilities because of any restriction, covenant or agreement entered into by any person having or having had an interest in the Leased Premises or the Shopping Center. If Lessee is prevented from or restricted in so using the Leased Premises or in exercising said rights because of any court order or other judicial determination arising out of any such restriction, covenant or agreement, the rents and other charges to be paid by Lessee under this Lease shall abate during the period Lessee is so prevented from or restricted in using the Leased Premises or exercising said rights; and if said period shall continue for ninety (90) days or more, Lessee may terminate this Lease by notice in writing to Lessor at any time thereafter during said period. From and after the execution and delivery hereof, Lessor shall defend, indemnify and save harmless Lessee against all actions, claims, costs (including reasonable attorney's fees) and loss arising out of the existence of any such restriction, covenant or agreement or allegation thereof.

Section 6.7 Lessor's Alterations. Lessor shall at its expense from time to time make any alterations, improvements or additions to the Leased Premises that may be required on account of any existing or future laws, ordinances or regulations of lawful authority except alterations, improvements or additions to the Leased Premises as may be required solely by reason of the nature of Lessee's business. If because of any such law, ordinance or regulation, Lessee is deprived of the use of the Leased Premises, the rents and other charges to be paid by Lessee under this Lease shall abate during the period of such deprivation.

Section 6.8 Lessee's Alterations. Lessee may at its expense from time to time make any non-structural alterations, changes or improvements in, on and to the Leased Premises which it may deem necessary or desirable. Lessee may make structural changes to the Leased Premises with the approval of Lessor which approval shall not be unreasonably withheld or delayed, provided that the changing or addition of interior partition walls, plumbing, electrical, and other lines shall not be deemed structural changes. Lessee shall not be required to, but may, remove any such alterations, changes or improvements at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise, provided Lessee shall repair any damage caused by such removal.

Section 6.9 Liens. Lessee shall keep the Leased Premises free from any mechanics or materialmen's liens for any labor or material furnished Lessee in connection with the Leased Premises, except that Lessee shall have the right to contest the validity or amount of any such lien.

Section 6.10 Fixtures. Any fixtures, equipment, signs or other property, however attached to or incorporated in the Leased Premises or the Shopping Center, belonging to the Lessee or its subtenants or licensees are to be and remain their property, and they shall have the right to

Page 8

remove them at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise, provided Lessee shall repair any damage caused by such removal.

Section 6.11  Signs.  Lessee shall have the exclusive right to place signs and advertisements on the exterior and interior of the Leased Premises including the walls and canopy of the Building, provided that during the last three (3) months of the term Lessor may place a "For Rent" or "For Sale" sign not in excess of 2' x 3' in size on any portion of the exterior of the Leased Premises other than on the plate glass or in any place obstructing Lessee's signs.  In the event any sign in the Shopping Center, other than the signs on the individual store facades, bears any name or advertisement other than that of the Shopping Center as a whole, Lessee shall have the right to place its name and/or advertising on a prominent position on such sign. Lessee's panel position on the existing Shopping Center pylon sign (located between the buildings numbered twenty-five (25) and twenty-seven (27) on the attached Exhibit A) shall be the top panel.  Lessee shall have the right to place and display pole banners in a place in the Common Facilities selected by Lessor . Lessor hereby agrees that all such signage may be changed from time to time without the consent of Lessor in order to conform such signage to any then existing standard signage of Moran Foods, Inc., or any of its franchisees or licenses, or any other entity affiliated with Moran Foods, Inc.  Lessor hereby pre-approves Lessee's sign criteria (including pole banners) attached hereto as Exhibit F.

Section 6.12  Vending Machines.  Notwithstanding anything to the contrary contained herein, Lessee shall be entitled, at its expense, to install and operate within or adjacent to the exterior of the Leased Premises, or to cause to be installed and operated within or adjacent to the exterior of the Leased Premises, vending machines, postage machines and/or any and all machines or devices used by the public and operated through the use of coins, tokens, credit cards or similar means (the "Vending Machines") but not more than ten (10) such machines. Lessee, or its subtenants, designees or licensees, or the actual owners of the Vending Machines, as the case may be, shall have the sole right to collect and retain any and all profits and receipts from such Vending Machines, and Lessor shall have no right to any such Vending Machines or to any of the receipts or profits generated therefrom.  For the purposes hereof, any Vending Machines installed or caused to be installed within or adjacent to the exterior of the Leased Premises shall be and remain the property of Lessee or its subtenants, designees or licensees, or the actual owners of the Vending Machines, as the case may be, and such Vending Machines shall be subject to removal by them at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise.  All utilities for machines under this Section 6.12 shall be at the sole obligation, expense and cost of the Lessee.

Section 6.13  Cart Theft Deterrence System.  Lessee shall have the right, at Lessee's sole cost and expense, (i) to install a cart theft deterrence system in a place in the Common Facilities selected by Lessee with Lessor's consent (not to be unreasonably withheld, conditioned or delayed) and (ii) to use reasonable portions of the Common Facilities to install signs and markings relating to Lessee's use of such system. Lessee shall complete any and all work necessary to install the cart theft deterrence system in a good and workmanlike manner, in accordance with all applicable governmental codes, ordinances and regulations, and without unreasonably interfering with the use and operation of the Shopping Center. Lessee shall not be required to, but may, remove the system at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise, provided Lessee shall repair any damage caused by such removal. If the cart theft deterrence system remains in the Shopping Center ten (10) days following the termination of this Lease by lapse of time or otherwise, such

Page 9

system shall be deemed part of the Shopping Center and shall be surrendered with the Leased Premises by Lessee.

## ARTICLE 7. RESTORATION

Section 7.1     Hazard Insurance. Lessor shall carry, with a reputable insurance company that is licensed to do business in the state where the Leased Premises are located and that is listed in Best's Insurance Reports as having a quality rating of not less than B+ (provided such a rating is available for insurance offered in the State of Texas in this locale), insurance on a "Comprehensive Replacement Cost Form" with a face amount equal to one hundred percent (100%) of the replacement value of the insured property, with a standard co-insurance endorsement of not more than ninety percent (90%), and with a deductible of no more than $50,000 against loss or damage resulting from fire and other insurable casualties. The property insurance shall cover and insure all buildings and improvements in the Shopping Center, including the Leased Premises. Lessor agrees that the proceeds of the insurance required by this Section 7.1 shall be used, to the extent necessary, to pay for the repairs and restorations required to be completed by Lessor under the terms of this Article 7. Before the beginning of the term of this Lease, Lessor shall deliver to Lessee a certificate of insurance that evidences the existence of the insurance required under this Section 7.1. After the commencement date and continuing until the expiration or earlier termination of this Lease, upon request by Lessee, Lessor shall deliver to Lessee a replacement certificate or a renewal certificate at least 30 days before the insurance required under this Section 7.1 is to expire.

Section 7.2     Release of Claim; Subrogation.

(a)     Lessor hereby releases and discharges Lessee, its subtenants, licensees and their agents and employees of and from all liability to Lessor and to anyone claiming by, through or under Lessor on account of any loss or damage resulting from or arising out of any fire or other casualty, however caused, excepting only if caused by the intentional acts of said Lessee, its agents, servants or employees.

(b)     Lessee hereby releases and discharges Lessor, its tenants, licensees and its agents and employees of and from all liability to Lessee and to anyone claiming by, through or under Lessee on account of any loss or damage resulting from or arising out of any fire or other casualty, however caused, excepting only the intentional acts of Lessor, its agents, servants or employees.

Section 7.3     Restoration. If the Leased Premises is damaged or destroyed by fire or other casualty, Lessor shall at its expense repair and restore the Leased Premises so as to be substantially the same as prior to such damage or destruction. Lessor shall begin such repairs or restoration within ninety (90) days from the date Lessor settles the insurance proceeds from the insurance maintained by Lessor under Section 7.1 and shall complete said repairs or restoration within one hundred eighty (180) days from the date Lessor is obligated to commence said repairs or restoration. Lessor shall diligently and in good faith prosecute the claim for such insurance proceeds to completion and shall use its reasonable efforts to obtain such insurance proceeds as soon as possible. The dates by which Lessor is to begin and complete said repairs or restoration shall be deferred for a period equal to any delay caused by reason of labor controversy, act of God, fire or other casualty, governmental regulations or other cause beyond the reasonable control of Lessor, provided Lessor has from time to time in writing kept Lessee fully advised of such delays and the cause thereof. If any other building(s) in the Shopping

Center is (are) damaged or destroyed by fire or other casualty, Lessor shall promptly either repair and restore or raze the building.

Notwithstanding the other provisions of this Section 7.3 and 7.4, in the event that more than fifty percent (50%) of the so called "in line" buildings in the Shopping Center shall be destroyed by fire or other casualty, and Lessor is not going to repair or restore such "in line" buildings in the Shopping Center as retail space, Lessor shall have the right to terminate this Lease by giving written notice of such termination within thirty (30) days of the date of such casualty effective as of the date of such termination notice (which termination notice shall include Lessor's representation and warranty to Lessee that Lessor is not going to repair or restore such "in line" buildings in the Shopping Center as retail space), provided that Lessor must, simultaneously therewith, terminate all other leases for the "in line" buildings in the Shopping Center.

Section 7.4    Last Two Years.  If the Leased Premises is damaged or destroyed by fire or other casualty during the last two (2) lease years of the term prior to the last date by which Lessee may exercise an option to extend the then current term and the cost of repairing or restoring the Leased Premises as required by Section 7.3 herein will exceed twice the rent per lease year, then Lessee shall have the option of terminating the Lease which may be exercised by written notice to Lessor within sixty (60) days after certification by Lessor to Lessee of its reasonable estimate of the cost of repairing or restoring the Leased Premises. If Lessee does not so terminate, Lessor shall have the option of requiring Lessee to decide whether to extend the then current term by exercising said option to extend the term for five (5) lease years or whether this Lease shall be terminated. Such option may be exercised by Lessor's giving Lessee written notice thereof within thirty (30) days after such fire or casualty. Within thirty (30) days after Lessee receives said notice, Lessee shall notify Lessor in writing whether it exercises said option and in the absence of such notice exercising said option this Lease shall terminate. Any notice by Lessee exercising said option following such notice from the Lessor shall be effective notwithstanding the fact that the last day by which Lessee otherwise had to exercise said option occurs subsequent to the date of such fire or other casualty. If such fire or other casualty occurs during the last two (2) years of the last option period or after the last date by which Lessee may exercise said option and Lessee has not exercised said option, then Lessor may terminate this Lease by notice in writing to Lessee given within thirty (30) days after such fire or other casualty.

Section 7.5    Rent Abatement.  If damage or destruction to the Building results in the total suspension of business in the Leased Premises or if damage or destruction to the Shopping Center reasonably results in total suspension of business in the Leased Premises, all rents and other charges payable by Lessee under this Lease shall abate from the date of such suspension of business until the earlier of (i) the date such business is resumed, or (ii) the date thirty (30) days following the completion of said repairs or restoration. If such damage or destruction or the work of repairing or restoring said improvements results in only a partial suspension of business, the abatement shall be apportioned accordingly.

Section 7.6    Failure to Restore.  If Lessor fails to begin or complete the repairs or restoration of the Building within the times and in the manner provided for in this Article 7, then Lessee may, in addition to any other remedies it may have, (i) terminate this Lease by notice in writing to Lessor at any time prior to said beginning or completion, as the case may be, or (ii) Lessee may perform said repairs or restoration or so much of them as it deems necessary or desirable and may recoup said costs by deducting said costs from all rents and other charges due thereafter.

Page 11

## ARTICLE 8. EMINENT DOMAIN

Section 8.1    Total.  If the entire Leased Premises is taken under the power of eminent domain, this Lease shall terminate on the date Lessee is deprived of possession pursuant to such taking.

Section 8.2    Partial.  If under the power of eminent domain, any part of the Leased Premises, or any part of the service areas accessory to the Leased Premises, or any part of the parking area outlined in orange, if any, on Exhibit A, is taken, or twenty percent (20%) or more of the total parking area in the Shopping Center is taken or if any access to the Shopping Center is taken by one or more takings, then, in any such event, Lessee may terminate this Lease by giving Lessor no less than ten (10) days' written notice thereof at any time after the date of such taking and before the expiration of ninety (90) days from the date Lessee is deprived of its right to use said portion of Building or the Common Facilities, as the case may be, pursuant to such taking.  Notwithstanding the foregoing, before exercising its right to terminate this Lease as set forth herein above, in the event any access to the Shopping Center is taken by one or more takings, Lessee agrees to first negotiate with Lessor in good faith to determine a mutually acceptable location for Lessor to construct a new point of access to the Shopping Center, which location shall not adversely affect Lessee's business.

Section 8.3    Restoration.  If a portion of the Leased Premises or Common Facilities is so taken and this Lease is not terminated therefor, the remainder of the Leased Premises or Common Facilities shall be restored by Lessor as soon as possible.

Section 8.4    Rent Abatement.  In the event of a partial taking as contemplated by Section 8.2, all rents and other charges payable by Lessee under this Lease shall be reduced from and after the date Lessee is deprived of possession of such portion of the Leased Premises in proportion to the floor area of the Leased Premises so taken.  In addition, if any such taking results in the suspension of business in the Leased Premises, all rents and other charges payable by Lessee under this Lease shall abate from the date of such suspension of business until the earlier of (i) the date such business is resumed, or (ii) the date thirty (30) days following the completion of said restoration by Lessor.

Section 8.5    Settlement.  For the purpose of this Article 8, a taking under the power of eminent domain shall include conveyances or dedications made in settlement of or in lieu of condemnation proceedings.

Section 8.6    Award.  Lessee and not Lessor shall be entitled to any portion of the award made to Lessee or Lessor for the value of Lessee's trade fixtures, leasehold improvements (except if completed by Lessor), business interruption and/or relocation expenses.  All compensation awarded for the taking of the Building, the fee and the leasehold shall belong to and be the property of Lessor, and Lessee shall not be entitled to any damages for the unexpired portion of the term of the Lease or injury to its leasehold interests except as provided for above.  Lessee shall have no claim against Lessor for the value of any portion of the unexpired term of this Lease; and Lessor shall have no obligation to include Lessee in any such claim.

Page 12

## ARTICLE 9. INDEMNITIES AND INSURANCE

Section 9.1    Lessee's Indemnity.    Lessee shall defend and indemnify the Lessor, its agents and employees, against any liability, claim of liability and expense incurred as a result of the liability or claim of liability (including reasonable attorney's fees) whether for death, injury to persons or damage to property (i) occurring on or arising out of the use of the Leased Premises during the term hereof except if caused by any act or omission to act by Lessor, its licensees or contractors, their agents or employees, (ii) arising out of any default by Lessee under this Lease; or (iii) arising out of any act or omission to act by Lessee, its agents, contractors or employees on the Common Facilities at any time or on the Leased Premises prior to the beginning of the term; all subject to the provisions of Section 7.2 hereof.

Section 9.2    Lessor's Indemnity.    Lessor shall defend and indemnify the Lessee, its subtenants, licensees and concessionaires, their agents and employees, against any liability, claim of liability and expense incurred as a result of the liability or claim (including reasonable attorney's fees) whether for injury to persons, including death, or damage to property (i) occurring on the Leased Premises prior to the beginning of the term hereof except if caused by any act or omission to act by Lessee, its licensees, concessionaires or contractors, their agents or employees, or occurring on the Leased Premises during the term if caused by any act or omission to act by Lessor, its licensees or contractors, their agents or employees; (ii) arising out of any default by Lessor under this Lease; or (iii) occurring on the Common Facilities, except if caused by any act or omission to act by Lessee, its subtenants, licensees, concessionaires or contractors, their agents or employees.

Section 9.3    Insurance.    Each of Lessor and Lessee shall, prior to the commencement of any construction or reconstruction by the applicable party in relation to the Leased Premises or the Shopping Center premises or prior to the commencement of the term, whichever is earlier, procure and maintain, or cause to be procured and maintained, an insurance policy in a form and from an insurer reasonably acceptable to the other party covering (i) liability with respect to any construction or reconstruction that the applicable party may perform or have performed in, upon or in connection with the Leased Premises and the Shopping Center premises; (ii) liability for ownership, maintenance and use of the Leased Premises (as to the Lessee) and the Shopping Center (as to the Lessor); and (iii) the party's contractual liability arising under Section 9.2 or Section 9.1. Lessor and Lessee may satisfy the obligation to procure and maintain such liability insurance policies with respect to any such construction or reconstruction by requiring its general contractor to procure and maintain such liability insurance and such liability insurance with respect to any such construction or reconstruction shall provide a combined single limit of not less than Two Million Dollars ($2,000,000), of which up to One Million Dollars ($1,000,000) may be maintained with so-called "umbrella liability coverage". Each of such insurance policies with respect to liability for ownership, maintenance and use of the Leased Premises (as to the Lessee) and the Shopping Center (as to the Lessor) and with respect to each party's respective contractual liability arising under Section 9.2 or 9.1 shall provide a combined single limit of not less than One Million Dollars ($1,000,000.00) per occurrence with no general aggregate or a general aggregate of not less than Two Million Dollars ($2,000,000.00). All of such liability insurance policies shall provide coverage on an "occurrence basis" and shall name as insureds or additional insureds each of the parties hereto. Lessor and Lessee shall each furnish the other with copies of the policy, or certificates or memoranda thereof. Lessee and Lessor reserve the right to provide coverage under a so-called blanket policy. Lessee reserves the right to self-insure so long as Lessee maintains a net worth of at least $50,000,000.00 as certified by a financial officer of Lessee upon the written request of Lessor.

## ARTICLE 10. TITLE AND POSSESSION

Section 10.1  Possession.  Intentionally Deleted.

Section 10.2  Quiet Enjoyment.  Lessor covenants that if the Lessee shall perform all of the covenants and provisions of this Lease to be performed by the Lessee, the Lessee shall peaceably and quietly occupy and enjoy the full possession and use of the Leased Premises and the use of the Common Facilities as herein provided. If at any time Lessor's title shall fail or Lessor is unable to grant rights to the Common Facilities as provided in this Lease, Lessee may at its option cancel this Lease by notice in writing to Lessor.

Section 10.3  Assignment and Subletting.  Lessee may from time to time (without the consent of Lessor) assign or reassign this Lease or sublease the whole or any part of the Leased Premises to any person, firm or corporation that is a franchisee or licensee of Lessee or to a corporation which is subsidiary or parent company to or affiliated with Lessee, or a corporation resulting from any reorganization or merger to which Lessee, its parent company or any of its subsidiaries or affiliates may be a party, or due to a change in ownership or control (the "Permitted Assigns"), provided that Lessee shall remain primarily liable for the performance of all of its obligations under this Lease.  Lessee agrees to give Lessor prompt written notice following any such assignment of this Lease or subletting of the Leased Premises.  Any assignee or subtenant shall be subject to all the terms of this Lease.  Except for the Permitted Assigns, Lessee shall not be entitled to assign this Lease or sublet all or any portion of the Leased Premises without Lessor's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  In the event of any assignment or subletting, Lessee shall remain primarily liable for the performance of all of its obligations under this Lease.

If Lessee desires to assign this Lease or sublet all of the Leased Premises to any party (specifically excluding the Permitted Assigns) and Lessor's consent is required, Lessee shall send a written notice (hereinafter called Lessee's Notice of Assignment") advising Lessor of Lessee's intention to assign this Lease or sublet all of the Leased Premises. Lessor shall have a period of thirty (30) days after receipt from Lessee of Lessee's Notice of Assignment to terminate this Lease and recapture the Leased Premises with no further obligations thereafter accruing from Lessor to Lessee, such termination to be effective thirty (30) days after receipt of Lessor's termination notice or to advise Lessee that Lessor consents or reasonably refuses to consent (specifically stating the reasons for such refusal) to such proposed sublease or assignment.  In the event that that Lessor elects to terminate this Lease and recapture the Leased Premises, Lessee shall have the right to withdraw its proposal or vacate and surrender possession of the Leased Premises no later than thirty (30) days from the date of Lessor's termination notice or such other period of time mutually agreed to by the parties.

Lessee may not sublease or assign this Lease to any party that would use the Leased Premises in violation of the use provisions of Section 6.1 of this Lease.

Section 10.4  Title And Authority.

(a)    Lessor represents to Lessee that it has good title to the Leased Premises and the Shopping Center in fee simple, subject only to interests not conflicting with the rights herein granted to Lessee.  Lessor also represents to Lessee that there are no contracts, leases or other agreements of any kind which adversely affect or limit Lessee's use of the Leased Premises or the Common Facilities in accordance with the terms of this Lease.

Page 14

(b)     Lessor represents to Lessee that (i) by entering into this Lease and leasing the Leased Premises to Lessee, Lessor will not breach or violate any other covenants, contracts, leases or other agreements of any kind to which Lessor is a party or breach or violate any judgment, order, or decree of any court or arbiter that is binding on Lessor or upon the Shopping Center, and (ii) Lessor has full right, power and authority to enter into this Lease and to perform the obligations of Lessor hereunder.

(c)     Lessee represents to Lessor that (i) by entering into this Lease and leasing the Leased Premises from Lessor, Lessee will not breach or violate any other covenants, contracts, leases or other agreements of any kind to which Lessee is a party or breach or violate any judgment, order, or decree of any court or arbiter that is binding on Lessee, and (ii) Lessee has full right, power and authority to enter into this Lease and to perform the obligations of Lessee hereunder.

(d)     Lessor shall indemnify and defend Lessee against any and all loss, cost, damage, claim, liability and expense of any kind whatsoever (including attorneys' fees, experts' fees, court costs, costs of investigation, and settlement costs), incurred by Lessee, or any officer, director or employee of Lessee, arising out of, resulting from or relating to (i) any breach by Lessor of any of Lessor's representations or warranties contained in this Lease, and/or (ii) any representation or warranty of Lessor in this Lease being false, inaccurate or misleading.

(e)     Lessee shall indemnify and defend Lessor against any and all loss, cost, damage, claim, liability and expense of any kind whatsoever (including attorneys' fees, experts' fees, court costs, costs of investigation, and settlement costs), incurred by Lessor, or any officer, director or employee of Lessor, arising out of, resulting from or relating to (i) any breach by Lessee of any of Lessee's representations or warranties contained in this Lease, and/or (ii) any representation or warranty of Lessee in this Lease being false, inaccurate or misleading.

Section 10.5  Subordination.  Lessor agrees to deliver to Lessee prior to the beginning of the term of this Lease, a written agreement, in substantially the form attached hereto as Exhibit C, from the holder of any deed of trust, trust deed or mortgage which has priority over this Lease that such holder will not disturb the rights of Lessee under this Lease so long as Lessee is not in default of this Lease.  If Lessor fails to deliver such an agreement, Lessee may terminate this Lease by written notice to Lessor.  Provided the Lessor is not in default, Lessee agrees to subordinate this Lease to any deed of trust, trust deed or mortgage which may hereafter be placed on the Leased Premises or the Shopping Center premises, provided such trustee or mortgagee thereunder shall agree, in substantially the form attached hereto as Exhibit C, that it will not disturb Lessee's right to possess the Leased Premises and other rights under this Lease so long as Lessee is not in default of this Lease.

Section 10.6  Memorandum of Lease.  At the request of either party, the parties shall execute a memorandum of this Lease in recordable form, in the form attached hereto as Exhibit D, stating the term of the Lease, the parties hereto and any use restrictions contained in this Lease. Except for such memorandum, this Lease will not be recorded.

Section 10.7  Estoppels.  Each party shall, within thirty (30) days after written request from the other party (but not more often than twice in any 12 month period), execute and deliver to the other party a certificate stating (a) that the Lease is in full force and effect, if such be the case, (b) the date of this Lease and any amendments thereto, (c) that the certifying party has not given or received a notice complying with the notice provisions in this Lease relating to a default which has not yet been cured, or providing details as to any outstanding default notice, (d) the date to which rent has been paid, and (e) the expiration date of the then current term of this Lease and the number of renewal periods remaining.  Such certificate shall be in substantially the form as that attached hereto as Exhibit G.

Page 15

## ARTICLE 11. ADDITIONAL RENT

Section 11.1  Taxes.  Lessor shall pay all taxes levied or assessed against the Shopping Center premises before they become delinquent and the parties further agree as follows:

(a)  As additional rent, Lessee shall pay to Lessor an amount equal to the "Taxes" for each calendar year of the term except that the amount to be paid by Lessee with respect to the calendar years during which the term begins and ends shall be adjusted pro rata on the basis of the number of days of the term falling within each of said calendar years.  If the base rent abates or is apportioned for any reason, the amounts due pursuant to this Section shall similarly abate or be apportioned.  Notwithstanding anything to the contrary, the total amount payable by Lessee for Taxes for the first lease year of this Lease shall not under any circumstances exceed a total of Five Thousand Seven Hundred Forty-Two and 32/100 Dollars ($5,742.30).

(b)  "Taxes" shall mean a pro rata share of the general real estate taxes levied on the Shopping Center based on the ratio of the floor area of the Leased Premises to the floor area of all floors of all buildings (including the Leased Premises) existing on the Shopping Center on the applicable assessment dates.

(c)  Lessee may in its own name or in the name of Lessor, contest the validity or amount of any such taxes or the assessments upon which the same are based, and Lessor agrees to render to Lessee all assistance reasonably possible, including joining in and signing any protest or pleading which Lessee may deem advisable.  If any rebate of such taxes is made, the rebate shall belong to Lessee (after deduction for payment of any fees or expenses incurred for any such tax reduction, abatement or rebate), to the extent Lessee has so reimbursed Lessor for the year for which such rebate is made.  If the Shopping Center is subject to a minimum assessment agreement or other agreement that precludes any contest of the amount of real estate taxes, Lessee shall only be obligated to pay its pro rata share of the amount of real estate taxes that would be payable without giving effect to such agreement.  Lessor shall have the right to contest the validity or amount of any such taxes or assessments upon the Shopping Center, and Lessee shall pay as additional rent Lessee's prorata share of any reasonable out of pocket fees incurred by Lessor in the prosecution of such tax matter; provided that if any rebate is made, Lessee shall be reimbursed for its prorata share of such rebate to the extent Lessee has so paid Lessor its prorata share for the year for which such rebate is made.

Section 11.2  Insurance Premiums.  As additional rent, Lessee shall from time to time pay to Lessor an amount equal to the "Premiums" for each "policy year" throughout the term hereof, except that the amount to be paid by Lessee with respect to the "policy year" in which the term begins and ends shall be adjusted pro rata on the basis of the number of days of the term falling within each of said policy years.  "Premiums" shall be deemed a pro rata share of the premiums for the so called "all risk" insurance maintained by Lessor under Section 7.1 above applicable to all the buildings in the Shopping Center based on the ratio of the ground floor of the Leased Premises' floor area to all floors of all buildings in the Shopping Center.  If the base rent abates or is apportioned for any reason, the amounts due pursuant to this Section shall similarly abate or be apportioned.  Notwithstanding anything to the contrary, the total amount payable by Lessee for Premiums for the first lease year of this Lease shall not under any circumstances exceed a total of Four Thousand Seven Hundred Eighty-Five and 25/100 Dollars ($4,785.25).

Page 16

Section 11.3 Common Area Charge. Lessee shall pay to Lessor, as additional rent, a proportionate share of the actual out-of-pocket cost incurred by Lessor in performing the maintenance required by Section 5.4 hereof and the actual out-of-pocket cost of procuring the insurance required by Section 9.3 hereof (the "CAM Charges"). The proportionate share shall be based on the ratio of the ground floor area of the Leased Premises to total floor area of all buildings in the Shopping Center. Such costs shall not include any overhead charges, administrative costs, management fees (except a management fee not to exceed five percent (5%) of CAM Charges, of which. Lessee shall pay its proportionate share) or capital expenditures. In the event rent abates or is apportioned, for any reason, the charges provided for in this Section shall also abate or be apportioned.

Notwithstanding anything to the contrary, the total amount payable by Lessee for CAM Charges for the first lease year of this Lease shall not under any circumstances exceed a total of Nine Thousand Five Hundred Seventy and 50/100 ($9,570.50), and that for each lease year thereafter Lessee's prorata share of CAM Charges shall not under any circumstances exceed 105% of Lessee's prorata share of CAM Charges for the immediately preceding lease year.

Section 11.3 Monthly Installments. Lessee shall pay Lessor monthly, together with Lessee's payment of base rent, 1/12th of Lessor's estimate of Lessee's annual liability under this Article for Taxes, Premiums and CAM Charges. Lessor's estimate of Lessee's annual liability under this Article shall be prepared and delivered to Lessee at the beginning of each calendar year and shall be based upon the amounts budgeted by Lessor for Taxes, Premiums and CAM Charges.

Within ninety (90) days after the end of each calendar year, Lessor shall provide to Lessee an itemized statement in reasonable detail showing the Taxes, Premiums and CAM Charges that were actually incurred by Lessor for said calendar year and the amount chargeable to Lessee, including the basis of computation. The itemized statement shall be subject to verification by Lessee, including the right to request additional evidence reasonably satisfactory to Lessee in order to substantiate such Taxes, Premiums and CAM Charges. If Lessee has overpaid Taxes, Premiums or CAM Charges, then Lessee shall credit such amount of overpayment against the next monthly rental payment then due by reducing such rental payment accordingly, except if during the last year of the term of this Lease, then Lessor shall reimburse the overpayment amount within thirty (30) days. If Lessee has underpaid Taxes, Premiums or CAM Charges, Lessee shall pay the balance owed to Lessor within thirty (30) days after Lessee's receipt of the itemized statement and verification by Lessee as to the amount due and the payment of such Taxes, Premiums and CAM Charges.

Lessor agrees to maintain copies of all contracts, invoices, canceled checks and other documentation reasonably required to support the billings for Taxes, Premiums and CAM Charges and, upon request made by Lessee within two (2) years after the conclusion of the applicable calendar year, to make such records and documentation available for audit by Lessee at Lessor's principal office during normal business hours and on a date mutually acceptable to both parties. If such audit discloses any error in the determination of Taxes, Premiums or CAM Charges, or in calculating Lessee's proportionate share thereof, Lessor shall refund to Lessee any overcharge or bill Lessee for any undercharge within 30 days of receipt of notice of the necessary adjustment from Lessee. The cost of such audit shall be paid by Lessee, unless Lessee shall be entitled to a refund in excess of five (5) percent of the amount calculated by Lessor, in which case Lessor shall reimburse Lessee for the costs of such audit, not to exceed $5,000.00 (whether such audit was performed by Lessee or by a third party).

## ARTICLE 12. HAZARDOUS WASTE

Section 12.1 Hazardous Material. As used herein, the term "Hazardous Material" means petroleum products, asbestos, tetrachloroethylene; polychlorinated benzyls; polychlorinated biphenyls; nuclear waste, underground storage tanks and any other hazardous or toxic substance, material or waste, which is or becomes regulated by any applicable federal, state or local laws, rules or regulations pertaining to any materials deemed to be hazardous (collectively "Environmental Laws"), whether originating from the Leased Premises or the Shopping Center, or migrating, flowing, percolating, defusing or in any way moving onto or under the Leased Premises or the Shopping Center.

Section 12.2 Lessee's Activity. Lessee shall not engage in any activity on or about the Leased Premises that violates any Environmental Laws. Lessee shall promptly, at Lessee's expense, take all investigative and/or remedial action required or ordered by any governmental unit or agency as to any contamination of the Leased Premises or the Shopping Center created by Lessee that violates any applicable Environmental Law. Lessee shall indemnify and hold Lessor, its agents, employees, lenders, ground tenant, if any, and the Leased Premises and Shopping Center harmless from any and all costs, claims, expenses, penalties and attorneys' fees arising out of a breach by Lessee of its covenants in this Section 12.2, including but not limited to, the investigation, remediation and/or abatement of any contamination therein involved.

Section 12.3 Lessor's Responsibilities. Lessor and Lessee agree as follows with respect to the existence or use of Hazardous Material on the Leased Premises or in the Shopping Center:

Lessor hereby represents, warrants and covenants to Lessee that, to its best knowledge,

(i) The Leased Premises and the Shopping Center are, as of the commencement of the term, (A) in compliance with all applicable Environmental Laws; and (B) free of any Hazardous Material in, on or under the Shopping Center except for those that are commonly used in Shopping Center facilities and in reasonable amounts.

(ii) Lessor shall be responsible for all costs (which costs shall not be included in Common Area Maintenance Cost) incurred in complying with any order, ruling or other requirement of any court or governmental body or agency having jurisdiction over the Shopping Center requiring Lessor to comply with any Environmental Laws in, on or about the Shopping Center and the Leased Premises including, without limitation, the cost of any required or necessary repair, cleanup or detoxification in the preparation of any closure or other required plans, excluding however, any such cost relating to Hazardous Material on the Leased Premises established to have been caused directly by Lessee's use of the Leased Premises.

(iii) To the extent commercially practical, Lessor shall take such action as is necessary to enforce the requirements contained in any leases or occupancy agreements with other tenants or occupants in the Shopping Center which relate to the handling, transportation, storage, treatment, use or disposition of Hazardous Material by such other tenants or occupants.

(iv) Lessor shall indemnify, defend and hold Lessee, its directors, officers, employees and agents and any successor to Lessee's interest in the Leased Premises harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys' fees, consultant fees

Page 18

and expert fees) caused by, arising out of or related to (A) the breach of any representation, warranty or covenant of Lessor contained herein or (B) Hazardous Material in, or about the Shopping Center, or the Leased Premises other than Hazardous Material established to have been caused directly by Lessee's use of the Leased Premises, or (C) any such Hazardous Material with respect to which any court or governmental body or agency having jurisdiction over the Shopping Center holds Lessor responsible for or otherwise requires Lessor to undertake any repair, cleanup, detoxification or other remedial action, excluding, however, Hazardous Material on the Leased Premises established to have been caused directly by Lessee's use of the Leased Premises.

Section 12.4 Interference with Business. In the event any Hazardous Material shall be present in, on or under the Shopping Center or the Leased Premises at any time during the term hereof, other than Hazardous Material established to have been caused directly by Lessee's use of the Leased Premises, and such presence or the cleanup, removal, repair, detoxification or other remedial action with respect to such Hazardous Material interferes with the conduct of Lessee's business on the Leased Premises, all rental payable by Lessee under this Lease shall be reduced for the duration of such interference based on the extent of such interference; provided, however, if such interference is material and interferes, or reasonably appears that it will interfere, with Lessee's use of the Leased Premises for at least a one hundred eighty (180) day period, Lessee shall have the right to terminate this Lease by written notice to Lessor.

## ARTICLE 13. GENERAL

### Section 13.1 Default.

(a)     If any rent is due and remains unpaid for ten (10) days after receipt of written notice from Lessor, or if Lessee breaches any of the other covenants of this Lease, and if such other breach continues for thirty (30) days after receipt of written notice from Lessor, or in the event Lessee shall file a petition in bankruptcy or arrangement, or be adjudicated a bankrupt, or make an assignment for the benefit of creditors, or take advantage of any insolvency act, same shall constitute an Event of Default and Lessor shall then, but not until then, have any and all rights and remedies available to it at law or in equity, including, but not limited to:

(i)     the right to sue for rent and other damages as it accrues pursuant to the terms of this Lease;

(ii)     the right, but not the obligation, to pay all sums and take all actions that are necessary or desirable to perform Lessee's obligation, and Lessee will reimburse Lessor for such reasonable sums and other reasonable costs incurred by Lessor as additional rent within thirty (30) days after demand therefore. The performance by Lessor of one of Lessee's obligations will not be construed as a modification or waiver of any provision of this Lease, and such obligation will remain the obligation of Lessee;

(iii)     the right to declare the Lessee's right to possession terminated, re-enter the Leased Premises, remove Lessee's property from the Leased Premises and store it for Lessee's account and at Lessee's expense, eject all persons from the Leased Premises and relet the Leased Premises, in which event Lessee shall continue to be liable for all of the Lessee's obligations under this Lease, as and when such obligations come due under the terms of this Lease, for the remainder of the current term of this Lease, provided that any amount received by Lessor from any reletting of the Leased Premises,

Page 19

after deduction of reasonable expenses incurred by Lessor for such reletting, shall be credited against Lessee's obligations; or

(iv)    the right to terminate this Lease by written notice to Lessee. In the event Lessor elects to terminate this Lease in accordance with the foregoing, Lessor may recover as damages from Lessee the unpaid rental and other amounts due hereunder which accrued prior to the effective date of such termination of the Lease and the present value of the excess, if any, of (i) the base rent and additional rent due under the terms of this Lease for the remainder of the then current term of this Lease, over (ii) the reasonable rental value of the Leased Premises for the remainder of the then current term of this Lease. The present value of such excess, if any, shall be determined by discounting such excess using a discount rate equal to the then current prime rate of interest announced by Bank of America NA, or its successor, as its prime rate for unsecured loans, regardless of what rate such bank actually charges its customers.

Notwithstanding the foregoing, if Lessee shall in good faith within said thirty (30) days commence to correct such non-monetary breach and diligently proceed therewith, then Lessor shall not have the right to exercise any remedies. Lessor shall be obligated to exercise reasonable efforts to mitigate any damages it may incur as a result of Lessee's default under this Lease. All rights and remedies provided for herein or otherwise existing at law or in equity are cumulative, and the exercise of one or more rights or remedies by Lessor shall not preclude or waive its right to the exercise of any or all of the others.

(b)    If Lessor breaches any of its covenants under this Lease, fails to make any required alteration or repair required to be made by Lessor under this Lease and such breach continues for thirty (30) days after receipt of written notice from Lessee (except that in case of emergency prior notice need not be given), then Lessee shall have any and all rights and remedies available to it at law or in equity and additionally may perform Lessor's obligations. Lessor shall, within ten (10) days after written demand, pay to Lessee the amount incurred by Lessee in performing Lessor's obligations under this Lease. If Lessor fails to pay, Lessee may deduct said amount from the rents and other charges due under this Lease.

Section 13.2 Legal Fees. In the event of legal action between Lessor and Lessee on account of any alleged breach or default by either under this Lease, the prevailing party in such action shall be entitled to be reimbursed by the other party in the amount of all reasonable attorneys' fees and other costs incurred by the prevailing party in connection with such action.

Section 13.3 Notices. Notices and demands required or permitted to be given under this Lease shall be given by registered or certified mail and shall be addressed:

If to Lessor:              Jefferson City Commons, LLC
                           48 East Old Country, #203
                           Mineola, NY 11501

or, at the last address at which rent is payable, and

If to Lessee:              Moran Foods, Inc.
                           Attn: Asset Management Group
                           100 Corporate Office Drive
                           Earth City, Missouri 63045

Page 20

With an additional copy to:    Moran Foods, Inc.
                               Attn: Legal Department
                               100 Corporate Office Drive
                               Earth City, Missouri 63045

or at such other address as Lessee shall designate by written notice to Lessor. Notices and demands shall be deemed to have been given when mailed.

Section 13.4    Rent Refund. Promptly after the termination or cancellation of this Lease for any reason or after the effective date of the abatement of rents and other charges under this Lease, whether entire or partial, Lessor shall refund to Lessee all rents and other charges paid by Lessee to the extent they are allocable to any period of time beyond the effective date of such termination, cancellation or abatement of rent and other charges.

Section 13.5    Holding Over. Subject to the rights of Lessee pursuant to Sections 6.8 and 6.10 hereof, Lessee shall at the termination of this Lease by lapse of time or otherwise yield up immediate possession of the Leased Premises; if it does not do so, Lessee shall pay as liquidated damages for the time such possession is withheld a sum equal to two (2) times the rent prorated on a daily basis. In no event shall such holding be deemed to create a tenancy from year to year, nor shall Lessor elect to create such a tenancy. Lessor may immediately bring an action to terminate said holdover tenancy.

Section 13.6    Commissions. Each party represents and warrants that it has not dealt with any real estate broker or agent in connection with this Lease and agrees to defend, indemnify and save the other party harmless of and from any and all claims for brokerage fees and commissions, which result from a breach of the foregoing representation.

Section 13.7    Waiver. The failure of Lessor or Lessee to insist upon strict performance by the other of any of the provisions of this Lease or to exercise any option herein conferred shall not be deemed as a waiver or relinquishment for the future of any such provision or option.

Section 13.8    Remedies. All rights and remedies provided for herein or otherwise existing at law or in equity are cumulative, and the exercise of one or more rights or remedies by either party shall not preclude or waive its right to the exercise of any or all of the others.

Section 13.9    No Offer. The submission of this Lease for examination does not constitute an offer to enter into a lease, and this Lease shall become effective only upon execution and delivery hereof by Lessor and Lessee.

Section 13.10    Interpretation. All provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each section hereof. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one lessor or lessee and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed. The captions of the articles and sections contained herein are for convenience only and do not define, limit, construe or describe the scope or intent of such articles or sections. If any provision of this Lease shall be held invalid, the validity of the remainder of this Lease shall not be affected thereby.

Section 13.11    Exhibits and Entire Agreement. All exhibits referred to in and attached to this Lease are hereby made a part of this Lease. This Lease and the Exhibits attached hereto

reflects the entire agreement of the parties concerning the Shopping Center, and no representations, inducements or agreements, whether oral or otherwise, between the parties not contained in this Lease shall be of any force or effect.

Section 13.12 Successors. This Lease shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns, and the covenants, agreements, conditions and undertakings in this Lease shall be construed as covenants running with the land. No third party, other than such heirs, legal representatives, successors and assigns, shall be entitled to enforce any or all of the provisions of this Lease or shall have any rights under this Lease whatsoever.

## ARTICLE 14. CONTINGENCIES

Section 14.1 Lessee's Title Examination Contingency. Lessor shall deliver to Lessee upon execution of this Lease, copies of any title policies or commitments it has in its possession regarding the Shopping Center. Lessee may obtain, at its own expense, such additional title evidence regarding the Shopping Center as it desires. Within thirty (30) days of the date hereof, Lessee may provide Lessor written notice of any title defect that interferes with the Lessee's rights under this Lease. If Lessor does not resolve the title defect within thirty (30) days of the written notice, Lessee may terminate this Lease by written notice to Lessor.

Section 14.2 Lessee's Environmental Contingency. Lessor shall deliver to Lessee upon execution of this Lease, copies of any reports of environmental assessments it has in its possession regarding the demised Premises. Lessee may obtain, at its own expense, such additional environmental investigations of the Shopping Center it desires, including physical inspections. If Lessee is not satisfied with the environmental condition of the demised Premises, in its sole discretion, Lessee may terminate this Lease by written notice to Lessor within thirty (30) days of the date of execution of this Lease.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed and affixed their respective seals to this Lease as of the day and year first above written.

LESSOR

JEFFERSON CITY COMMONS, LLC,
a Texas limited liability company

By: _____

Name: _____M - Ma\e\an_____

Title: _____M-c-ko_____

Federal Tax Identification No.:_____

LESSEE

MORAN FOODS, INC.,
a Missouri corporation

By: _____

Name: ___G. F. Meyer_____

Title: ___Vice President_____

Attest: _____

Title: _____

Attest: _____

Title: ___Julie Stenger, Assistant Secretary___

Witness: _____

Witness: _____

Witness: _____

Witness: ___Michele Walther___

Page 23

## ACKNOWLEDGMENT

STATE OF _____ )
                ) SS.
COUNTY OF _____ )

On this __/__ day of _____ , 2007, before me, a Notary Public in and for said County, personally appeared _____ , to me personally known, who being by me duly sworn, did say that he/she is _____ of _____ ,
a _____ , and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said _____ by it voluntarily executed.

_____
Notary Public

Commission Expiration Date:

M. DAVID BAHR
Notary Public, State of New York
No. 31-4826470
Qualified in New York County
Commission Expires Sept. 30, 20__

STATE OF MISSOURI     )
                      ) SS.
COUNTY OF ST. LOUIS   )

On this _6th_ day of __July__ , 2007, before me, a Notary Public in and for said County, personally appeared G. F. Meyer, to me personally known, who being by me duly sworn, did say that he is Vice President of MORAN FOODS, INC., a Missouri corporation, and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said corporation by it voluntarily executed.

_____
Notary Public

My Commission Expires:

Lynn W. McQuesten
Notary Public
State of Missouri
St. Charles County
My Comm. Exp.: Feb. 4, 2008

## EXHIBIT A

### SITE PLAN

Leased Premises is outlined in red (Section 1.1).

Shopping Center is outlined in blue (Section 1.1)

No-Build Area is shown cross-hatched (Section 6.2)

Portion of Parking Area outlined in orange (Section 8.2)

# JEFFERSON CITY COMMONS, LLC.
EXHIBIT A
## PORT ARTHUR, TEXAS



## EXHIBIT AA

### LEGAL DESCRIPTION OF SHOPPING CENTER

GF# 250886
Commitment No. 44-901-80-250886

DESCRIPTION

NOTEEXHIBIT "A"

BEING that certain tract of land containing 23.484 acres, more or less, out of and a part of Lots One, Two, Seven and Eight (1, 2, 7 & 8), Block Six (6), Range "G", of The lands of the Port Arthur Land Company, Port Arthur, Jefferson County, Texas, as said tract is more particularly described by metes and bounds as follows:

BEING at 23.484 acre tract of land consisting of those certain tracts of land conveyed to Jefferson City interest, more fully described and recorded as Tract 1, Tract 2A and Tract 2B in Volume 1673, Page 463 of the Deed Records of Jefferson County, Texas. said 23.484 acre tract also being out of and a part of Lots 1, 2, 7 and 8, Block 6, Range "G" of the Port Arthur Land Company Subdivision as recorded in Volume 1, Page 22 of the Map Records of Jefferson County, Texas and is more particularly described as follows:

BEGINNING at a concrete monument found at the intersection of the Southwest line of Twin City Highway (State Highway 347), right-of-way and the Northwest line of 32nd Street right-of-way (60 feet wide), same being the East corner of said Tract 2B;

THENCE South 41 deg. 13 min. 00 sec. West along and with the Southeast line of said Jefferson City tracts, same being the Northwest line of said 32nd Street right-of-way, a distance of 655.81 feet to a 3/4 inch iron pipe found for the South corner of said Jefferson City Tract 1, same being the East corner of the Normandy Place Subdivision as recorded in Volume 1560, Page 326 of said Deed Records;

THENCE in a Northwesterly direction along and with the Southwest line of said Jefferson City Tract 1, same being the Northeast line of said Normandy Place Subdivision the following courses and distances:

North 48 deg. 49 min. 55 sec. West a distance of 1085.90 feet to a 5/8 inch iron found for corner;
North 48 deg. 51 min. 48 sec. West a distance of 398.13 feet to a 5/8 inch iron rod set for corner;

THENCE in Northeasterly direction along and with the Northwest line of said Jefferson Tract 1, same being the Southeast line of that certain Charles S. Nacol and Ida Nacol 3.4094 acre tract of land, more fully described and recorded in Volume 1880, Page 380 of said Deed Records the following courses and distances:

North 41 deg. 06 min. 23 sec. East a distance of 154.87 feet to a bent 5/8 inch iron found for corner;
South 48 deg. 53 min. 37 sec. West a distance of 40.00 feet to a 5/8 inch iron rod set for corner;
North 41 deg. 06 min. 23 sec. East a distance of 196.00 feet to a 5/8 inch iron rod set for corner;

South 48 deg. 53 min. 37 sec. East a distance of 40.00 feet to a 5/8 inch iron rod set for corner;

North 41 deg. 06 min. 23 sec. East a distance of 328.88 feet to a 1/2 inch iron rod

TU-TB-UU.TU.4 7AM,

# 2/ 2

# 250886
Commitment No. 44-901-80-250886                                           Page 2

## DESCRIPTION

Found for corner in the Southwest line of said Twin City Highway (State Highway 347)
right-of-way;

THENCE in a Southeasterly direction along and with the Northeast line of said
Jefferson City Tract 1 and Tract 2B, same being the Southeast line of said Twin City
Highway (State Highway 347) right-of-way the following courses and distances:

South 48 deg. 53 min. 17 sec. East a distance of 796.64 feet to a 5/8 inch iron rod
set for corner;

South 50 deg. 07 min. 17 sec. East a distance of 688.89 feet to the PLACE OF
BEGINNING, containing 23.484 acres of land, more or less.

NOTE:    This Company does not represent that the above acreage or square footage
calculations are correct.

FROM :Malachite Group of Texas Inc     FAX NO. :4059622428          Oct. 16 2006 03:06PM  P2

INITIALS:
TENANT: *M.Q.B.*
LANDLORD: *RH*

## EXHIBIT "B"

### ATTACHED TO AND MADE A PART
### OF
### SHOPPING CENTER LEASE AGREEMENT

#### Legal Description

Being certain store premises in the Jefferson City Shopping Center in Port Arthur, Texas, containing approximately Eighteen Thousand (18,000) square feet of ground floor store space, being an area fronting (90) ninety feet with a depth of (200)two hundred feet, as shown and delineated upon the attached plot plan of said Jefferson city Shopping Center (Exhibit "A") as that area outlined in or shaded, reference to such plot plan (Exhibit "A") being here made for all purposes.

## EXHIBIT B

### LP WORK

All utilities shall be furnished to the Leased Premises and shall be in good operating order and shall be separately metered. Upon delivery to Lessee, the Leased Premises shall be in compliance with all applicable state and local building, fire and zoning codes. Lessor shall, at Lessor's expense, deliver the Leased Premises to Lessee in broom-clean condition and shall place the roof, floor, exterior walls, mechanical systems, heating, ventilating and air-conditioning systems, utilities, electrical systems, plumbing systems, sewer systems and all other systems and facilities servicing the Leased Premises, in good operating order and condition and in compliance with all applicable governmental laws, ordinances, regulations, codes and requirements, including without limitation, state and local codes, all applicable fire protection requirements and all requirements of the fire marshal.

In addition to the items provided for in the preceding paragraph, the Lessor, at Lessor's expense, will do the following:

1.  Lessor to provide 25 tons of HVAC as follows: two (2) five (5) ton and two (2) seven and half (7 1/2) ton HVAC systems with ductwork, thermostats, diffusers and hook-up per Save-A-Lot plans and specifications.

2.  Lessor to provide electrical service which shall consist of 208/240 volt, 3-phase, 4-wire, 1200 amp service and panels, including breakers and outlets with main disconnect at the rear of the store per Save-A-Lot plans and specifications.

3.  Lessor to provide 4 inches of a smooth concrete slab per Save-A-Lot plans and specifications.

4.  Lessor to provide two (2) handicapped restrooms per local and state codes. Restrooms are to include all necessary fixtures such as handicap rails, sink, mirrors, soap and paper dispensers, ceiling lights, exhaust fans, drinking fountain and water closets. Walls finished with 5RD. Metal door with privacy lockset and self closure per Save-A-Lot plans and specifications.

5.  Lessor to provide a dropped ceiling with 1-8ft T8 4 bulb fixture per 64 sq. ft. of sales floor on 8ft. centers and all ceiling tiles in a suspended ceiling system. Said tile and grid system shall be per Save-A-Lot plans and specifications.

6.  Lessor to provide drywall extending to the bottom of the roof structure; drywall surface to be taped and sanded with one coat of primer on all perimeter and demising walls per state and local codes and Save-A-Lot plans and specifications.

7.  Lessor shall complete an automatic fire sprinkler system, if required, above and below the ceiling to meet state and local code requirements and Save-A-Lot plans and specifications.

8.  Lessor to provide a glass storefront with 40 linear feet of glass and two (2) automatic doors per Save-A-Lot plans and specifications.

9.  Lessor to provide all roof penetrations sealed per Save-A-Lot plans and specifications.

10. Lessor to provide an 8' x 10' overhead coiling door along with a 3' x 7' fire door per state and local codes and Save-A-Lot plans and specifications.

11. Lessor to re-stripe the portion of the parking lot in front of the Leased Premises; said portion to be the area designated as the "No Build Area" on Exhibit A.

12. Lessor to improve the front fascia of the building with dryvit or similar finish material. The front exterior plans will be mutually agreeable to the Lessor and Lessee.

13. All construction shall meet ADA, EPA, OSHA and Health Department rules and regulations currently in effect, as well as any state and local code requirements. Further, Lessor covenants that the Leased Premises are free from asbestos, mold and other hazardous substances and gases; and Lessor shall remove (according to all applicable laws) any such asbestos and other hazardous substances and gases prior to delivery of the Leased Premises to Lessee.

Upon delivery of the Leased Premises to Lessee, Lessor shall provide and maintain (in compliance with state and local codes) all necessary pipes, mains, conduits, wire and cables to the Leased Premises for water, gas, electricity and telephone services. Lessor will provide telephone lines to the D-mark and to the Leased Premises. Notwithstanding the foregoing, Lessee will not be responsible for the cost of any utility tap fees, cost of meter installation or any other cost which may be levied by a utility provider other than those charges specifically related to the Lessee's consumption of such utility. Such costs shall be the sole responsibility of the Lessor.

## EXHIBIT C

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

#### *Jefferson City Shopping Center*
#### *3513 Twin City Highway*
#### *Port Arthur, TX*

This Agreement is made by JEFFERSON CITY COMMONS, LLC, a Texas limited liability company ("Lessor"), _____ ("Mortgagee") and MORAN FOODS, INC., a Missouri corporation, d/b/a Save-A-Lot, Ltd. ("Lessee") as of the _____ day of _____, 20___ (the "Execution Date").

### RECITALS:

A.  Lessor is the owner of certain property (the "Shopping Center") situate in the City of Port Arthur, County of Jefferson, State of Texas, and more particularly described in Exhibit A attached hereto;

B.  Lessor and Lessee are parties to a lease dated _____, 2007 as amended from time to time thereafter (said lease as so amended hereinafter referred to as Lease) covering a portion of the Shopping Center ("Leased Premises"), which Leased Premises are more fully described in the Lease;

C.  The Shopping Center is to be encumbered by a certain _____ ("Mortgage") to secure certain obligations of Lessor to Mortgagee, which Mortgage is more fully described as follows: _____ executed by Lessor to Mortgagee dated _____ and recorded in the office of _____, County of Jefferson, State of Texas as Document No. _____.

### AGREEMENT:

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  Mortgagee hereby gives its consent to the Lease. Mortgagee warrants and represents to Lessee that it is the owner of the Mortgage; that the Mortgage has not been assigned and that Mortgagee has caused no other liens or encumbrances to be created against the Shopping Center other than the Mortgage.

2.  Lessee, for itself and its successors and assigns, does hereby agree that all right, title and interest which Lessee, its successors and assigns, may have in and to the Leased Premises or any part thereof, shall be, and the same hereby is made, subject and subordinate to the lien of the Mortgage, with the same force and effect as though the Mortgage had been executed, delivered and recorded prior to the date of the Lease, provided that Mortgagee hereby agrees that all condemnation awards and property insurance proceeds payable with respect to the Shopping Center shall be applied and paid in the manner set forth in the Lease.

3.  So long as Lessee is not in default, beyond any applicable cure period, in the payment of

rent or in the performance of any of the terms, covenants or conditions of the Lease requiring performance on the part of Lessee, (a) Mortgagee will not join Lessee as a party defendant in any action or proceeding for the purpose of foreclosing the Mortgage; (b) any sale or transfer of the Shopping Center or of Lessor's interest in the Lease, pursuant to foreclosure of the Mortgage or voluntary conveyance or other proceeding in lieu of foreclosure, will be subject and subordinate to Lessee's possession under the Lease; and (c) the Lease will continue in full force and effect according to its terms.

4.    So long as Lessee is not in default, beyond any applicable cure period, in the payment of rent or in the performance of any of the terms, covenants or conditions of the Lease requiring performance on the part of Lessee, if the Shopping Center shall be transferred to and owned by Mortgagee, or any assignee of Mortgagee or purchaser at judicial sale or any transferee under an action in lieu thereof, by reason of foreclosure or other remedial proceedings brought by Mortgagee or any assignee of Mortgagee or by any other similar manner, Lessee's rights to possession of the Leased Premises under the Lease shall not be terminated thereby, rather Lessee shall attorn to and be bound to Mortgagee or any such assignee, purchaser or transferee under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining; and Mortgagee or any such assignee, purchaser or transferee shall be bound, as the Lessor, to Lessee under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining except that neither Mortgagee nor any such assignee, purchaser or transferee shall be:

    4.1.    Bound by any rent or additional rent which Lessee may have paid for more than thirty (30) days in advance of its due date to any prior Lessor.

    4.2.    Bound by any material amendment to the Lease entered into subsequent to the date of this Agreement which has not been consented to by Mortgagee which consent shall not be unreasonably withheld or delayed.

    4.3.    Bound by any provision of the Lease restricting the use of properties owned by Mortgagee, other than the Shopping Center, for purposes which compete with Lessee.

5.    Subject to the provisions hereof, the Lease now is, and shall at all times continue to be, subject and subordinate in each and every respect to the lien of the Mortgage and to any and all amendments and renewals thereof.

6.    This Agreement shall be binding upon and shall inure to the benefit of Lessor, Mortgagee and Lessee, and their respective heirs, personal representatives, transferees, successors and assigns. Except as provided in Section 8, no action on the part of any party to this Agreement shall be construed to be a waiver, release or relinquishment of any rights under this Agreement unless said waiver, release or relinquishment is expressly contained in an instrument executed by the party against whom the waiver, release or relinquishment is being enforced.

7.    Lessee agrees that, during the term of the Mortgage, Lessee shall furnish to said Mortgagee the same notice or notices of default by Lessor that Lessee is required to furnish to Lessor under the Lease and Mortgagee shall have the same rights and period to cure such default as Lessor has under the Lease.

8.   Mortgagee agrees to notify Lessee in writing of any release, termination or satisfaction of the Mortgage. If Lessee requests in writing that Mortgagee indicate whether the Mortgage has been released, terminated or satisfied and Mortgagee fails to provide written notice to Lessee indicating whether the Mortgage has been released, terminated or satisfied within twenty (20) days of such request, then Lessee shall no longer be required to give Mortgagee notices under Section 7 and Mortgagee shall not have the right to cure defaults as provided in Section 7 and Mortgagee's consent to material amendments to the Lease, as provided in Section 4.2, shall not be required.

9.   Lessor will by a separate Assignment of Leases and Rents (hereinafter referred to as the "Assignment of Leases") assign its interest in the rents and payments due under the Lease to Mortgagee as security for repayment of its obligations to Mortgagee described in the Mortgage. If in the future there is a default by Lessor in the performance and observance of the terms of the Mortgage, Mortgagee may, at its option under the Assignment of Leases, require that all subsequent rents and other payments due Lessor under the Lease be paid directly to it. Upon notification to that effect to Lessee by Mortgagee, Lessor hereby authorizes and directs Lessee, and Lessee agrees (provided that such agreement shall not affect or limit any of Lessee's rights under the Lease, including but not limited to any rights of offset), to pay any subsequent payments due to Lessor under the terms of the Lease to Mortgagee. Lessor represents and warrants to Lessee that there are no other collateral assignments of the Lease or rents in effect, other than the Assignment of Leases to Mortgagee. Lessor further agrees that this Agreement shall constitute a direction to and full authority to Lessee to pay all such amounts to Mortgagee without proof of the default relied upon and that Lessee is hereby irrevocably authorized to rely upon and comply with (and shall be fully protected in so doing) any notice or demand by Mortgagee for the payment to Mortgagee of any amounts due to Lessor under the Lease and Lessee shall have no duty or obligation to inquire as to whether any default under the Mortgage has actually occurred or is then existing.

10.  This Agreement is made and executed under and in all respects is to be governed by and construed in accordance with the laws of the State of Texas.

11.  Any notices required or given under this Agreement shall be in writing and shall be sent by U. S. Certified Mail, postage prepaid and shall be sent to the following addresses:

To Mortgagee:   _____
                _____
                _____
                _____

To Lessor:      Jefferson City Commons, LLC
                48 East Old Country, #203
                Mineola, TX 11501

To Lessee:      Moran Foods, Inc.

        Attn:           Asset           Management      Group

        100     Corporate       Office          Drive

Earth City, MO 63045

With copy to:    Moran Foods, Inc.
                 Attn: Legal Department
                 100 Corporate Office Drive
                 Earth City, Missouri 63045

The addresses for such notices may be changed by written notice to the other party of at least thirty (30) days given as provided above.  Notices given as provided above shall be deemed complete upon mailing.

12.    This Agreement may be signed in counterparts and each counterpart shall be effective as an original when a counterpart has been signed by all parties.

13.    This Agreement contains the entire agreement between the parties concerning the matters addressed herein and no representations, inducements, promises, understandings or agreements (whether express or implied and whether oral or written) made before the execution of this Agreement will change the terms of this Agreement. No covenants shall be implied into any of the terms or provisions of this Agreement. This Agreement may be changed or modified only by a writing that all parties have signed.  This Agreement shall not be binding on any party until it is executed and delivered by each party hereto.

*[Signature Page Follows]*

The parties hereto have executed this Agreement as of the Execution date.

LESSOR:
JEFFERSON CITY COMMONS, LLC

By: _____
Name: _____
Its: _____

MORTGAGEE:

_____

By: _____
Name: _____
Its: _____

LESSEE:
MORAN FOODS, INC.

By: _____
Name: _____
Its: _____

## ACKNOWLEDGMENTS

STATE OF _____)

COUNTY OF_____) } SS.

On this _____ day of _____, 200__, before me, a Notary Public in and for said County, personally appeared _____, to me personally known, who being by me duly   sworn,   did   say   that   he/she   is   _____   of _____, a _____, and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said _____ by it voluntarily executed.

_____

Notary Public

Commission Expiration Date:

STATE OF _____)

COUNTY OF_____) } SS.

On this _____ day of _____, 200__, before me, a Notary Public in and for said County, personally appeared _____, to me personally known, who being by me duly   sworn,   did   say   that   he/she   is   _____   of _____, and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said _____ by it voluntarily executed.

_____

Notary Public

Commission Expiration Date:

STATE OF MISSOURI        )
                         )SS.
COUNTY OF ST. LOUIS      )

On this _____ day of _____, 200__, before me, a Notary Public in and for said County, personally appeared _____, to me personally known, who being by me duly sworn, did say that he/she is Vice President of Moran Foods, Inc., a Missouri corporation, and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said corporation by it voluntarily executed.

_____
Notary Public

My Commission Expires:

Drafted By:
MORAN FOODS, INC.
Attn: Legal Department
100 Corporate Office Drive
Earth City, Missouri 63045

## EXHIBIT D

## MEMORANDUM OF LEASE

### *Jefferson City Shopping Center*
### *3513 Twin City Highway*
### *Port Arthur, TX*

This Memorandum of Lease is entered into and by JEFFERSON CITY COMMONS, LLC, a Texas limited liability company ("Lessor") and MORAN FOODS, INC., a Missouri corporation, d/b/a Save A Lot, Ltd. ("Lessee") as of the _____ day of _____, 2007 (the "Execution Date").

### RECITALS:

A.    Lessor and Lessee have entered into a certain lease dated _____ 2007 (the "Lease"), whereby Lessor has leased to Lessee certain real property, together with all improvements thereon, outlined in red on the site plan attached hereto as Exhibit A and made a part hereof (the "Premises"). The Premises are part of the shopping center on the property legally described on Exhibit AA attached hereto and made a part hereof (the "Shopping Center").

B.    The parties wish to give notice of the existence of the Lease.

NOW, THEREFORE, in consideration of $1.00 and other good and valuable consideration, the receipt and adequacy whereof are hereby acknowledged, the parties hereto agree as follows:

1.    Pursuant to the Lease, Lessor has demised and leased to Lessee, and Lessee has hired and taken from Lessor, the Leased Premises.

2.    The term of the Lease will commence on the earlier of (a) Lessee's opening of the Premises for business with the public, or (b) 120 days following the acceptance by Lessee of possession of the Leased Premises as provided for in Article 4 of the Lease (the "Commencement Date") and shall end on the last day of the seventh (7th) lease year, as defined in the Lease. Lessee has the right and privilege to extend the Lease for three (3) successive extension terms of five (5) years each.

3.    Pursuant to the Lease, the Lessor agrees that no portion of the Shopping Center, except for the Leased Premises as to Section 3.1, shall be used or operated as follows:

   3.1    as a supermarket or other store, or department within a store, for the sale of food, groceries, fruit, produce, dairy products, vegetables, bakery products, or meats; or

   3.2    as an adult bookstore, massage parlor, or any other establishment which provides live adult entertainment or which sells, rents or exhibits pornographic or obscene materials, as an abortion clinic, flea market, or vehicle sales; or

   3.3    within two hundred fifty (250) feet of the Leased Premises as a nightclub (not including establishments with live music and dancing which operate primarily as

restaurants) or discotheque, off-track betting business, or store selling strictly firearms or ammunition.

3.4    In addition, no portion of the Shopping Center located between and including the premises numbered twenty-three (23) and seventeen (17) on Exhibit A shall be used or operated as a movie theatre, tire store and service facility with service bays, or so-called "call center".

The restrictions in Section 3.1 shall not apply to (i) the following existing tenants (their successors and assigns; provided that Lessor agrees to withhold its consent to any assignment, sublease or change in use, which would conflict with the exclusive use granted to Lessee herein): Port Arthur Bingo, Dollar General, Citi Trends, Ramirez Imports, Texas State Optical, Naomi Fashions, Moon Palace, Sav-On Office Supplies, One Stop Beauty, Beauty Salon, Sarah's Bakery, Rainbow Apparel, Sun Loan Company, Side Pocket, Affordable Furniture, Colors for Men, Dollar Supreme, Biomat USA, Inc., Burke's Outlet, La Morenita Meat Market, Radio Shack, EZ Pawn, Texas State Bank, Burger King, Paradise Café, Ice Cream Store, for so long as such tenant is operating in its existing premises under its existing lease and for the purposes already permitted in its existing lease; (ii) restaurants (including fast food restaurants, delicatessens, eat in restaurants and take out restaurants) from selling prepared foods for on and off premises consumption; (iii) discount general merchandise stores such as, but not limited to, stores such as Family Dollar, Dollar Tree and Big Lots; provided that not more than 150 linear feet of total shelving area (including coolers and freezers) shall be used for the sale/display of food items for off-premises consumption and not more than two 4-foot coolers and one 4-foot freezer for the sale/display of food items for off-premises consumption; or (iv) the selling of food items as incidental to a tenant's primary use. For purposes hereof, the term "incidental" shall mean that not more than ten (10) linear feet of total shelving area may be devoted to the sale/display of food items. Notwithstanding the foregoing, in no event shall any portion of the Shopping Center (except for the Leased Premises and the existing La Morenita Meat Market, its successors and assigns, for so long as such La Morenita Meat Market (or its successors/assigns) is operating in its existing premises under its existing lease and for the purposes already permitted in its existing lease) be used for the sale or display of fresh fruit and produce, fresh butchered or case-ready meat, poultry or fish products.

4.    The terms and conditions of the Lease are incorporated by reference into this Memorandum of Lease as if such terms were written out at length. In the event of a conflict between this Memorandum of Lease and the Lease, the terms and conditions of the Lease shall govern. For a complete statement of the rights, privileges and obligations created under and by the Lease, reference is hereby made to the Lease.

*[Signature Page Follows]*

Lessee and Lessor have executed this Memorandum of Lease as of the Execution Date.

LESSEE:                                    LESSOR:

MORAN FOODS, INC.                          JEFFERSON CITY COMMONS, LLC


By:_____               By:_____

Name: G. F. Meyer                          Name:_____

Its: Vice President                        Its:_____


Witness:_____               Witness:_____
Print Name:_____               Print Name:_____


Witness:_____               Witness:_____
Print Name:_____               Print Name:_____

STATE OF MISSOURI      )
                       ) SS.
COUNTY OF ST. LOUIS    )

On this _____ day of _____, 2007, before me, a Notary Public in and for said County, personally appeared G. F. Meyer, to me personally known, who being by me duly sworn, did say that he is Vice President of Moran Foods, Inc., a Missouri corporation, and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said corporation by it voluntarily executed.

_____
Notary Public

My Commission Expires:

STATE OF _____)
                       ) SS.
COUNTY OF_____)

On this _____ day of _____, 2007, before me, a Notary Public in and for said County, personally appeared _____, to me personally known, who being by me duly sworn, did say that he/she is _____ of _____, a _____, and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said _____ by it voluntarily executed.

_____
Notary Public

Commission Expiration Date:

This Instrument was drafted by:
MORAN FOODS, INC.
Attn: Legal Department
100 Corporate Office Drive
Earth City, Missouri 63045

## EXHIBIT A

Site Plan to Memorandum of Lease

## EXHIBIT AA

Legal Description to Memorandum of Lease

## EXHIBIT E

### EXISTING TENANT EXCLUSIVES

# JEFFERSON CITY SHOPPING CENTER
# LIST OF TENANTS EXCLUSIONS, CLAUSES
# AND RESTRICTIONS SUMMARY

1.    PORT ARTHUR BINGO - NON-COMPETE ADDENDUM: LANDLORD SHALL NOT LEASE SPACE OR OTHERWISE PROVIDE FACILITIES FOR BUSINESSES OR OTHER OPERATIONS THAT ARE DEEMED COMPETITIVE TO TENANT'S BUSINESS. THIS INCLUDES THE FOLLOWING: BINGO OR BINGO RELATED OPERATIONS AND SUPPLIES, AMUSEMENT DEVICES SUCH AS "8 LINERS" AND OTHER ELECTRONIC AND/OR MECHANICAL DEVICES THAT ALLOW PATRONS THE CHANCE TO WIN PRIZES OF CASH, REPRESENTATIONS OF CASH, AND/OR MERCHANDISE.

2.    DOLLAR GENERAL - LESSOR COVENANTS AND AGREES NOT TO LEASE, RENT, OCCUPY, OR ALLOW TO BE OCCUPIED, ANY PART OF THE SHOPPING CENTER PREMISES FOR THE PURPOSE OF CONDUCTING BUSINESS AS OR FOR USE AS A FAMILY DOLLAR STORE, BILL'S DOLLAR STORE, FRED'S OR SUPER TEN. SHOULD LESSEE, OR A SUBTENANT OR ASSIGNEE OF LESSEE, INTENTIONALLY CEASE TO CONDUCT BUSINESS IN THE DEMISED PREMISES, THEN THIS COVENANT SHALL TERMINATE UPON THE DATE OF CESSATION OF THE BUSINESS. THIS COVENANT SHALL RUN WITH THE LEASE. LESSOR ACKNOWLEDGES THAT IN THE VENT OF ANY BREACH HEREOF LESSEE'S REMEDIES AT LAW WOULD BE INADEQUATE AND THEREFORE, AND IN THE EVENT, LESSEE SHALL BE ENTITLED TO CANCEL THIS LEASE OR TO RELIEF BY INJUNCTION, OR OTHERWISE, AS LESSEE MAY ELECT IN ITS SOLE DISCRETION. LESSEE'S REMEDIES, IN ANY EVENT, SHALL BE CUMULATIVE RATHER THAN EXCLUSIVE.

3.    CITI TRENDS - LANDLORD AGREES NOT TO LEASE OR SUBLEASE ANY SPACE IN THE SHOPPING CENTER AFTER FEBRUARY 3, 2005 TO ANY TENANT WHOSE BUSINESS IS THE OPERATION OF A DISCOUNT CLOTHING STORE OR ANY BUSINESS SIMILAR TO OR IN SUBSTANTIAL COMPETITION WITH THE BUSINESS OF TENANT. BUSINESS SIMILAR TO THAT OF TENANT SHALL BE INTERPRETED TO INCLUDE DISCOUNT CLOTHING STORES OR OFF-PRICE CLOTHING STORES, INCLUDING BUT NOT LIMITED TO ONE-PRICE, ITS FASHION, SIMPLY FASHION, FASHION CENTS, DOTS, CATO, FASHION BUG, AF WRIGHT AND ANY AFFILIATES OF THESE STORES. BUSINESS IS SUBSTANTIAL COMPETITION WITH TENANT SHALL BE INTERPRETED TO INCLUDE BUT NOT BE LIMITED TO ALL THOSE WHICH DEVOTE THIRTY PERCENT (30%) OR MORE OF THEIR SALES TO ITEMS OF MERCHANDISE WHICH ARE IDENTICAL TO, OR SUBSTANTIALLY THE SAME

AS, OR WHICH, FOR PRACTICAL PURPOSES, PERFORM THE SAME FUNCTION AS THOSE OFFERED FOR SALE BY TENANT. IN THE EVENT LANDLORD FAILS TO COMPLY WITH THE "EXCLUSIVE USE" CLAUSE, TENANT MAY EITHER A)PAY ONLY 4% OF GROSS SALES AS RENT IN LIEU OF THE AMOUNTS SET FORTH IN PROVISIONS 3 AND 4 HEREINABOVE UNTIL LANDLORD CURES SUCH VIOLATION; OR B) TENANT MAY, AT TENANT'S OPTION, TERMINATE THIS LEASE UPON PROVIDING LANDLORD THIRTY (30) DAYS PRIOR WRITTEN NOTICE.

ANCHOR CLAUSE: IN THE EVENT THAT DOLLAR GENERAL ("ANCHOR TENANT") CEASES TO OPERATE IN THE SHOPPING CENTER, AND COMMENCING UPON THE DATE THAT THE ANCHOR TENANT CEASES TO OPERATE, TENANT SHALL HAVE THE RIGHT TO PAY, IN LIEU OF THE ANNUAL RENTAL RATE AND PERCENTAGE RENTAL, AN AMOUNT EQUAL TO FOUR PERCENT (4%) OF GROSS MONTHLY SALES ("REDUCED RENT") FOR A PERIOD OF ONE YEAR. IF LANDLORD DOES NOT REPLACE THE ANCHOR TENANT WITHIN ONE YEAR WITH A SIMILAR USE TENANT COMPRISING SUBSTANTIALLY THE SAME SQUARE FOOTAGE AND WHICH SHALL BE OPERATING, TENANT SHALL HAVE THE RIGHT TO A) CONTINUE PAYING THE REDUCED RENT, OR B) TERMINATE THIS LEASE. THE REDUCED RENT SHALL BE PAID TO LANDLORD WITHIN TWENTY (20) DAYS OF THE END OF THE PRECEDING MONTH, AND ANY PERCENTAGE RENTAL AMOUNT PAID IN LIEU OF THE BASE RENT RATE SHALL NOT EXCEED THE BASE RENT RATE.

4.   RAMIREZ IMPORTS - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

5.   TEXAS STATE OPTICAL - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

6.   NAOMI FASHIONS - NO EXCLUSIONS, CLAUSES OR RESTRICTIONS.

7.   MOON PALACE - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

8.   SAV-ON OFFICE SUPPLIES -NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

9.   ONE STOP BEAUTY - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

10.  BEAUTY SALON - NO EXCLUSIONS, CLAUSES OR RESTRICTIONS.

11.  SARAH'S BAKERY - NO EXCLUSIONS, CLAUSES OR RESTRICTIONS.

12.  RAINBOW APPAREL - LANDLORD AGREES NOT TO LEASE SPACE
     AFTER NOVEMBER 2, 1993 IN THIS CENTER TO ANY TENANT USING THE
     "ONE PRICE CONCEPT" OR THE "CEILING PRICE CONCEPT" FOR THE SALE OF
     LADIES CLOTHING DURING THE TERM OF THIS LEASE AND ANY
     EXTENSIONS THEREOF. LANDLORD ALSO AGREES NOT TO PERMIT ANY
     EXISTING TENANT IN THIS CENTER AS OF NOVEMBER 2, 1993 TO CHANGE
     ITS BUSINESS TO THE "ONE PRICE CONCEPT" OR THE "CEILING PRICE
     CONCEPT" FOR THE SALE OF LADIES CLOTHING DURING THE TERM OF THIS
     LEASE OR ANY EXTENSIONS THEREOF. IN THE EVENT THAT THE LANDLORD
     ALLOWS A "ONE PRICE CONCEPT" OR "CEILING PRICE CONCEPT" TO OPEN
     FOR BUSINESS DURING THE LEASE TERM OR ANY EXTENSION THEREOF,
     TENANT SHALL HAVE THE OPTION TO (I) PAY ONE HALF OF THE FIXED
     MINIMUM RENT OR (II) TERMINATE THE LEASE.

13.  SUN LOAN COMPANY - NO EXCLUSIONS, CLAUSES, OR
     RESTRICTIONS.

14.  SIDE POCKET - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

15.  AFFORDABLE FURNITURE - NO EXCLUSIONS, CLAUSES, OR
     RESTRICTIONS.

16.  COLORS FOR MEN - NO EXCLUSIONS, CLAUSES OR RESTRICTIONS.

17.  DOLLAR SUPREME - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

18.  BIOMAT USA, INC. - LESSOR AGREES TO REFRAIN FROM LEASING TO
     A LIQUOR STORE OR ANY ESTABLISHMENT WHICH WILL EXCLUSIVELY
     SALE LIQUOR WITHIN 100 FEET ON EACH SIDE OF LEASED PROPERTY.

19.  BURKE'S OUTLET - NON-PERMISSIBLE USE: IF A GOVERNMENTAL
     AUTHORITY PROHIBITS, FOR MORE THAN SIXTY (60) DAYS, THE USE OF THE
     DEMISED PREMISES AS A RETAIL STORE FOR REASONS BEYOND THE
     TENANT'S REASONABLE CONTROL, THEN TENANT SHALL HAVE THE RIGHT
     TO TERMINATE THIS LEASE AS OF THE DATE OF SUCH PROHIBITION, BY
     WRITTEN NOTICE TO THE LANDLORD. EXCEPT FOR EXISTING LEASES,
     LANDLORD AGREES THAT UNLESS TENANT CONSENTS IN WRITING, NONE
     OF THE PROPERTY SHALL BE OCCUPIED BY ANY ENTERTAINMENT

FROM :Malachite Group of.Texas.Inc    FAX NO. :4099622428    Oct. 16 2006 03:08PM P6

FACILITY, RECREATIONAL FACILITY, NON-RETAIL FACILITY, OR
HAZARDOUS OR UNDESIRABLE FACILITY. A.)AS USED HEREIN,
"ENTERTAINMENT FACILITY" OR "RECREATIONAL FACILITY" INCLUDES
BUT IS NOT LIMITED TO, MASSAGE PARLOR, MOVIE THEATER, A BAR
(EXCEPT AS AN INCIDENT TO A FULL KITCHEN RESTAURANT OPERATION
WITH LIQUOR SALES NOT EXCEEDING TWENTY PERCENT (20%) OF SALES), A
TAVERN, AND AMUSEMENT ARCADE, BILLIARDS ROOM, POOL HALL,
BOWLING ALLEY. LIVE ENTERTAINMENT FACILITY, STAGE PRODUCTION(S),
VIDEO GAME ROOM, SKATING RINK, BINGO PARLOR, OR OTHER PLACE OF
PUBLIC AMUSEMENT. NOTWITHSTANDING THE FOREGOING, THE
FOLLOWING USES SHALL BE PERMITTED PROVIDED THEY ARE LOCATED
MORE THAN ONE HUNDRED FEET (100') AWAY FROM THE DEMISED
PREMISES: MOVIE THEATER, AN AMUSEMENT ARCADE OR A RESTAURANT
OPERATION WHICH PROVIDES AMUSEMENTS (SUCH AS CHUCK-E-CHEESE),
BILLIARDS ROOM, BOWLING ALLEY, VIDEO GAME ROOM, SKATING RINK.
B.) AS USED HEREIN, "NON-RETAIL FACILITY" INCLUDES, BUT IN NOT
LIMITED TO, PROFESSIONAL SPACE AND OFFICES (EXCEPT AS IS
INCIDENTAL TO A RETAIL OPERATION), WAREHOUSING OPERATIONS,
OFFICES, MEETING HALLS, AN OFFICE BUILDING OR PLACE FOR OFFICE
USAGE OF ANY NATURE, AND A MEETING HALL OR PLACE FOR PRIVATE
CLUBS OR ORGANIZATIONS. HOWEVER, UP TO 30,000 SQUARE FEET MAY BE
USED FOR RETAIL ORIENTED OFFICE SPACE COMMONLY PERMITTED IN
SHOPPING CENTERS SUCH AS REALTOR, DENTAL, MEDICAL, TRAVEL
AGENCY, AND BANKS. C.) AS USED HEREIN, "HAZARDOUS OR UNDESIRABLE
FACILITY" INCLUDES BUT IN NOT LIMITED TO, GAS STATIONS (EXCEPT
EXISTING LOCATED UPON OUTPARCELS ONLY), MOTORCYCLE SERVICE
SHOPS (THIS PROHIBITION SHALL NOT APPLY TO A SALES ONLY
OPERATION), GUN SHOPS, PAWN SHOPS, FLEA MARKETS, MASSAGE
PARLORS, ADULT BOOK OR ADULT VIDEO STORES, OR OTHER BUSINESSES
WHICH SELL OR DISPLAY PORNOGRAPHIC MATERIAL OR OPERATES
BUSINESSES THAT ARE UNSUITABLE FOR CHILDREN TO VISIT AND
PATRONIZE, INDUSTRIAL OR MANUFACTURING USES, AUTOMOBILE, BOAT
OR TRAILER SALES, OR ANY USE WHERE INVENTORY IS STORED OR
DISPLAYED IN THE PARKING AREAS OF THE SHOPPING CENTER. IT IS
AGREED BETWEEN THE PARTIES THAT PARKING AREAS AND OTHER
COMMON FACILITIES SHOULD NOTE BE BURDENED BY EITHER LARGE
SCALE OR PROTRACTED USE WHICH IS OFTEN ASSOCIATED WITH MANY OF
THE ABOVE PROHIBITED USES. LANDLORD FURTHER AGREES THAT, IN THE
EVENT OF A VIOLATION OF THE PROHIBITED USES FOR A PERIOD OF SIXTY
(60) DAYS AFTER NOTICE FROM TENANT TO LANDLORD, TENANT'S RENT
DUE UNDER PARAGRAPH 3 OF THIS LEASE (BOTH GROSS ANNUAL RENT
AND PERCENTAGE RENT) SHALL BE REDUCED TO THREE PERCENT (3%) OF
GROSS RECEIPTS UNTIL SUCH TIME AS SUCH NONCOMPLIANCE IS CURED.
THE AMOUNT OF REDUCTION IN PERCENTAGE RENT SHALL BE BASED
UPON THE PROPORTION THAT THE NUMBER OF DAYS THE

FROM :Malachite Group of Texas Inc     FAX NO. :4099622428          Oct. 16 2006 03:09PM P7

NONCOMPLIANCE EXISTS BEARS TO THE TOTAL NUMBER OF DAYS IN THE LEASE YEAR.

20. LA MORENITA MEAT MARKET - NO EXCLUSIONS, CLAUSES OR RESTRICTIONS

21. RADIO SHACK - LESSOR COVENANTS THAT DURING THE LEASE TERM, NO SPACE WITHIN THE SHOPPING CENTER, OTHER THAN THE PREMISES, OR ANY ADJACENT PROPERTY OWNED BY LESSOR, SHALL BE USED FOR (I.) THE RETAIL SALE OR DISPLAY OF ELECTRONIC EQUIPMENT AND COMPONENTS, INCLUDING, BUT NOT LIMITED TO, ALL TYPES OF TELECOMMUNICATION AND TRANSMITTING EQUIPMENT, COMPUTERS AND RELATED ACCESSORIES, AND AUDIO/VIDEO EQUIPMENT AND ACCESSORIES; OR (II) THE CONNECTION, INSTALLATION, SALE, DISPLAY OR PROMOTION OF OFF-PREMISES (INTERNET, ON-LINE, BROADBAND, NARROWBAND, DSL, CALBE MODEM, SATELLITE ) ACCESS SERVICES, ACCESS DEVICES OR RELATED TOOLS, SERVICES, EQUIPMENT, OR ACCESSORIES WHICH ENABLE OR UTILIZE CONNECTION TO WHAT IS COMMONLY KNOWN TODAY AS THE "INTERNET" OR ANY ENHANCEMENT THEREOF OR SUCCESSOR THERETO (THE "PROTECTED MERCHANDISE").

IF LESSOR FAILS TO COMPLY WITH THE PROVISIONS OF THIS SECTION WITHIN 30 DAYS AFTER LESSOR'S RECEIPT OF NOTICE OF THE VIOLATION, LESSEE MAY: (I) PAY 3% OF GROSS SALES MONTHLY, IN ARREARS WITHIN 20 DAYS AFTER THE END OF EACH CALENDAR MONTH, IN LIEU OF FIXED MINIMUM RENT AND ALL ADDITIONAL CHARGES UNDER THE LEASE UNTIL THE VIOLATION IS CURED: (II) TERMINATE THE LEASE; AND/OR (III) PURSUE ANY AND ALL LEGAL OR EQUITABLE REMEDIES AVAILABLE TO LESSEE. IF LESSEE ELECTS TO PAY A PERCENTAGE OF GROSS SALES IN LIEU OF FIXED MINIMUM RENT AND ADDITIONAL CHARGES AS PROVIDED ABOVE, LESSEE SHALL RETAIN THE RIGHT TO TERMINATE THIS LEASE.

THE PROVISIONS OF THIS SECTION SHALL NOT APPLY TO STORES OVER 10,000 SQUARE FEET OR (I) THE RETAIL SALE OR DISPLAY OF TELEVISION, VCR'S, OFFICE EQUIPMENT OR RELATED EQUIPMENT AND ACCESSORIES, PROVIDED SUCH MERCHANDISE IS DISPLAYED IN NOT MORE THAN 100 SQUARE FEET OF DISPLAY AREA; OR (II) ANY EXISTING TENANT OR RENEWAL OF EXISTING TENANT WHICH IS PERMITTED TO SELL AND DISPLAY THE PROTECTED MERCHANDISE AS OF THE DATE OF THIS AGREEMENT.

22. EZ PAWN - LESSOR COVENANTS THAT DURING THE PRIMARY TERM OF THIS LEASE AND ANY RENEWALS THEREOF, THAT IT WILL NOT LEASE OR CONSENT TO THE SUBLEASE OF THE LEASE PREMISES (OR ANY OTHER

5

PART OF THE LAND ON WHICH THE LEASE PREMISES IS LOCATED, OR ANY
OTHER SPACE WITHIN THE SAME OR ANY ADJACENT BUILDING OR
SHOPPING CENTER) TO ANOTHER PAWN SHOP.

23. TEXAS STATE BANK - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

24. BURGER KING - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

25. PARADISE CAFÉ - NO EXCLUSIONS, CLAUSES OR RESTRICTIONS.

26. ICE CREAM STORE - NO EXCLUSIONS, CLAUSES, OR RESTRICTIONS.

6

## EXHIBIT F

### LESSEE'S SIGN CRITERIA



meat produce dairy frozen

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | 1'-6" | 1'-0" | 5'-0 3/8" | 7'-10" | 5'-4 ½" | 6'-4 3/4" |
| | 2'-0" | 1'-4" | 6'-8 ½" | 10'-5" | 7'-2" | 8'-6" |

SIGN NOTES:
NON ILLUMINATED FORMED LETTERS

LETTER DEPTH:
2 ½" DEEP

LETTER CONSTRUCTION:
THERMAL FORMED FROM 3/16" SOLAR GRADE ACRYLSTEEL.
EDGES TO BE CUT AND GROUND SMOOTH

MOUNTING TYPE:
MOUNTING STUD PADS TO BE WELDED TO SECOND SURFACE WITH
A MINIMUM OF (4) FOUR STUDS PER LETTER

FINISH:
LETTERS TO BE PAINTED TO MATCH PMS #288c BLUE.

VARIOUS

SOUTHWEST signs
The difference is your identity
210-545-3221 • www.southwestsigns.com • (800)-627-3221
7208 So. W.W.White Rd.  San Antonio, Texas 78220

| General | | Faces | Structure | Electrical | |
|---|---|---|---|---|---|
| MANUFACTURE AND INSTALL OR REFACE: | | TYPE OF FACES: | (DAY) SIDE | LAMPS: | |
| | | | FRAME: | EST. AMPS: | |
| CABINET SIZE & COLOR: | | COLORS: | FILLER: | EST. NEON: | |
| SQUARE FOOTAGE: | | SHOWN | RADIUS: | BALLAST: | |
| RETAINER SIZE: | | | POLE COLOR & SIZE: | VOLTAGE: | |
| DEPTH SIZE CABINET: | | | HOLE SIZE: | (UL) | |

THIS IS AN ORIGINAL UNPUBLISHED
DRAWING CREATED BY SWS SIGNS
IT IS SUBMITTED FOR YOUR
PERSONAL USE IN CONNECTION
WITH A PROJECT BEING PLANNED
FOR YOU BY SWS SIGNS. IT IS NOT
TO BE SHOWN TO ANYONE OUTSIDE
YOUR ORGANIZATION, NOR IS IT TO
BE USED, REPRODUCED, COPIED OR
EXHIBITED IN ANY FASHION.

SAVE A LOT!

| CUSTOMER APPROVAL: | | | | |
|---|---|---|---|---|
| Revision: | 7-21-01 | Date: | 7-29-03 | |
| Drawn By: | E. Lacs | Sales Rep: | Guy C. | |
| Scale: | - | Dwg. No. | D0000-004 | |

### EXHIBIT G

### ESTOPPEL CERTIFICATE

*Jefferson City Shopping Center*
*3513 Twin City Highway*
*Port Arthur, TX*

DATED:

TO:

RE:    Lease Agreement, for property located at                                  , Port Arthur,
       TX, (the "Lease") Store #_____

Ladies and Gentlemen:

The undersigned certifies to you, to the best of the undersigned's knowledge, as follows:

1.    The Lease is in full force and effect and has not been amended except as set forth in
      Exhibit 1.

2.    Rent payment of _____/mo ($_____ base rent plus _____% sales tax) has
      been paid through _____, 20___.

3.    The undersigned has not given or received a notice complying with the notice provisions
      in the Lease relating to a default that has not yet been cured.

4.    The Commencement Date of the Lease was _____, 20___. The expiration
      date of the present term of the Lease, excluding unexercised renewals, is
      _____, 20___.

**MORAN FOODS, INC. d/b/a Save-A-Lot, Ltd.**

By:

Name:       G.F. Meyer

Its:        Vice President

## EXHIBIT 1

1.     Revised Commencement Letter dated _____, 20____.

# EXHIBIT B



MORAN FOODS, INC. D/B/A SAVE-A-LOT, LTD.
A SUPERVALU COMPANY

STEPHEN P. LODEWYCK
ASSOCIATE REAL ESTATE DEVELOPMENT COUNSEL
DIRECT DIAL: 314.592.9639
FAX: 314.592.9666
E-Mail: stephen.lodewyck@save-a-lot.com

January 10, 2008

Jefferson City Commons, LLC
Attention: Mr. Manouchehr Malekan
48 East Old Country, #203
Mineola, NY 11501

**SENT VIA CERTIFIED MAIL**
RETURN RECEIPT REQUESTED

Re:     Save-A-Lot Store #713
        *3513 Twin City Highway, Suite 22*
        *Port Arthur, Texas*

## NOTICE OF TERMINATION

Dear Mr. Malekan:

Reference is made to that certain Lease dated July 10, 2007 ("**Lease**") by and between Moran Foods, Inc., as Lessee ("*SAL*"), and Jefferson City Commons, LLC, as Lessor ("*JCC*"), relating to certain premises situated in the Jefferson City Shopping Center at 3513 Twin City Highway in Port Arthur, Texas.

Section 4.3 of the Lease provides:

"Notwithstanding any delays, whether within or beyond the control of Lessor, if the LP Work has not been completed...and actual exclusive possession of the Leased Premises tendered to Lessee on or before the date six (6) months from the date hereof, Lessee may cancel this Lease by notice in writing to Lessor given at any time thereafter prior to such completion and tender."

JCC has failed to complete the LP Work and tender actual exclusive possession of the Leased Premises to Lessee on or before the date six (6) months from the date of the Lease (January 10, 2008). Therefore, this correspondence shall serve as written notice that Lessee has terminated the Lease pursuant to the aforementioned language in Section 4.3 effective as of January 10, 2008.

*Jefferson City Commons, LLC*
*Attention:  Mr. Manouchehr Malekan*
*January 10, 2008*
*Page 2*

Copies of this notice have been sent to your attorney, Mr. David Jaroslawicz of Jaroslawicz & Jaros, LLC, via fax and First Class US Mail. We request that all future communications by or on behalf of JCC be directed to the undersigned.

Very truly yours,

MORAN FOODS, INC.

Stephen P. Lodewyck,
Associate Real Estate Development Counsel

Cc:     Addressee via facsimile at (516) 877-1680

        Mr. David Jaroslawicz, Esq.
        via First Class US Mail and facsimile at (212) 227-5090

        Mr. Rick F. Meyer