David B. Picker [DP-9658]
Suzanne Ilene Schiller [*pro hac vice* admission pending]
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8888 / FAX- (215) 241-8844
e-mail: dpicker@lawsgr.com
*Lead Counsel for Defendant*

David N. Mair [DM-8883]
KAISER SAURBORN & MAIR, P.C.
111 Broadway
New York, New York 10006
Tel: 212-338-9100 / FAX- 212-338-9088
e-mail: mair@ksmlaw.com
*Local Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFERSON CITY COMMONS, LLC, : | Docket No. **08 Civ. 4866 (LAK)** |
| : | ECF Case |
| Plaintiff, : | |
| v. : | |
| : | **DECLARATION OF** |
| MORAN FOODS, INC. d/b/a : | **DAVID B. PICKER** |
| SAVE-A-LOT, LTD., : | **IN SUPPORT OF** |
| : | **MOTION TO DISMISS** |
| Defendant. : | |

COMMONWEALTH OF PENNSYLVANIA    :
                                : ss.:
COUNTY OF PHILADELPHIA          :

DAVID B. PICKER, pursuant to 28 U.S.C. §1746, declares and affirms as follows:

1.    I am an attorney, duly licensed to practice law in the State of New York and

before this Court, associated with the firm of Spector Gadon & Rosen, P.C., lead counsel for

Defendant Moran Foods, Inc. d/b/a Save-A-Lot, Ltd. ("Save-A-Lot")  I make this Declaration in

474276-1

support of Save-A-Lot's Motion to Dismiss this action, pursuant to F.R.Civ.P. 12(b)(6), for failure to state a claim.

2.    Plaintiff commenced this action against Save-A-Lot by filing its Summons and Complaint in the Supreme Court of the State of New York, County of New York, on May 7, 2008.  Save-A-Lot was served the same day.  A true copy of the Summons and Complaint, with its Exhibits, is attached as Exhibit **1** hereto.

3.    On May 27, 2008, Save-A-Lot removed this action to this Court pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446, by reason of complete diversity of the citizenship of the parties and an amount in controversy exceeding $75,000.00.  On May 28, 2008, the parties stipulated to extend Save-A-Lot's time to "answer or otherwise move" to June 9, 2008.

4.    In its Complaint, Plaintiff landlord seeks to assert a breach of contract claim against Save-A-Lot for breach of a commercial lease.  Save-A-Lot canceled the lease pursuant to a lease provision expressly allowing it to do so if Plaintiff failed to do certain construction and build-out work within the time the lease required Plaintiff to do it.  The Complaint fails to allege Plaintiff's own due performance of its contractual obligations under the Lease, and admits that Plaintiff failed to perform the construction and build-out work within the time required.

5.    For the reasons set forth in the accompanying Memorandum of Law, the Complaint therefore fails to state a cause of action against Save-A-Lot, and should be dismissed.

6.    I declare under penalties of perjury that the foregoing is true and correct.


Date:    June 6, 2008
         Philadelphia, PA


                              _____
                              DAVID B. PICKER

474276-1

# EXHIBIT 1

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
05/07/2008
CT Log Number 513400776

|||||||||||||||||||||||||||||||||||||||||||||||||

**TO:**     Lori Eilers
            SuperValu Inc.
            11840 Valley View Road
            Eden Prairie, MN 55344-

**RE:**     **Process Served in New York**

**FOR:**    Moran Foods, Inc. (Domestic State: MO)

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

**TITLE OF ACTION:**                    Jefferson City Commons, LLC, Pltf. vs. Moran Foods, Inc., etc., Dft.

**DOCUMENT(S) SERVED:**                 Summons, Verified Complaint, Exhibit(s)

**COURT/AGENCY:**                       New York County: Supreme Court, NY
                                        Case # 601379/08

**NATURE OF ACTION:**                   Breach of Agreement - After Pltf. had expanded substantial funds to prepare the
                                        premises for the Dft., the Dft. fabricated a reason not to move into the premises, in
                                        violation of the terms of the lease

**ON WHOM PROCESS WAS SERVED:**         C T Corporation System, New York, NY

**DATE AND HOUR OF SERVICE:**           By Process Server on 05/07/2008 at 15:27

**APPEARANCE OR ANSWER DUE:**           Within 20 days after the service, exclusive of the day of service

**ATTORNEY(S) / SENDER(S):**            David Jaroslawicz
                                        Jaroslawicz & Jaros, LLC
                                        225 Broadway
                                        24th Floor
                                        New York, NY 10007
                                        212-227-2780

**ACTION ITEMS:**                       SOP Papers with Transmittal, via Fed Ex 2 Day , 790501755242
                                        Image SOP - Page(s): 66
                                        Email Notification, Lori Eilers LORI.EILERS@SUPERVALU.COM
                                        Email Notification, Jennifer Gibson Jennifer.m.gibson@supervalu.com

**SIGNED:**                             C T Corporation System
**PER:**                                Christopher Tilton
**ADDRESS:**                            111 Eighth Avenue
                                        New York, NY 10011
**TELEPHONE:**                          212-894-8940

Page 1 of 1 / AF

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of package only, not contents.

*SUPREME COURT OF THE STATE OF NEW YORK*
*COUNTY OF NEW YORK*

Index No. 609379/08
Date Purchased 5-7-08
Plaintiff(s) designate(s)
*NEW YORK*
County as the place of trial.

JEFFERSON CITY COMMONS, LLC

Plaintiff,

-against-

MORAN FOODS, INC. d/b/a SAVE-A-LOT, LTD.,

Defendant.

The basis of venue is
Defendant's address

*SUMMONS*
Plaintiff(s) reside at
48 East Old Country Road
Mineola, New York 11501

County of Nassau

To the above named Defendant(s):

    *You are hereby summoned* to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's Attorney(s) within twenty days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  New York, New York
      May 7, 2008

JAROSLAWICZ & JAROS, LLC
Attorneys for Plaintiff
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780

By: _____
          David Jaroslawicz

Defendant(s) address(es):

MORAN FOODS, INC.
d/b/a SAVE-A-LOT, LTD.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10019

NEW YORK
COUNTY CLERK'S OFFICE

MAY 07 2008

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

JEFFERSON CITY COMMONS, LLC                    Index No. 601379|08

                Plaintiff,        **VERIFIED COMPLAINT**

   -against-

MORAN FOODS, INC. d/b/a SAVE-A-LOT, LTD.,

                Defendant.

-----------------------------------------------------------------x

      Plaintiff, by its attorneys, Jaroslawicz & Jaros, complaining of the defendants, upon

information and belief, alleges as follows:

**THE PARTIES**

1.     At all times hereinafter mentioned, plaintiff is a Texas limited liability company.

2.     At all times hereinafter mentioned, plaintiff has offices in New York.

3.     At all times hereinafter mentioned, the plaintiff owned the premises known as

Jefferson City Shopping Center, located at 3513 Twin City Highway, Port Arthur, Texas.

4.     At all times hereinafter mentioned, the defendant Moran Foods, Inc. is a foreign

corporation, duly organized and existing under and by virtue of the laws of the State of Missouri.

5.     At all times hereinafter mentioned, the defendant has designated New York County

as its County.

6.     At all times hereinafter mentioned, the defendant does business as Save-A-Lot<

Ltd.

## THE UNDERLYING FACTS

7.    The parties entered into a lease agreement dated July 10, 2007 with respect to the aforementioned premises whereby plaintiff would lease a store to the defendant to be known as Store #713 at the aforementioned location; a copy of the lease is annexed hereto as Exhibit A and incorporated herein.

8.    After plaintiff had expended substantial funds to prepare the premises for the defendant, the defendant fabricated a reason not to move into the premises, in violation of the terms of the lease (Exhibit B).

9.    The reason provided for terminating the lease was a pretext; the defendant made a corporate decision to close several stores in that part of Texas.

10.    Thereafter, the defendant was notified that it would be held responsible for damages under the lease.

## AS AND FOR A FIRST CAUSE OF ACTION

11.    Pursuant to the terms of the lease, ¶3.2, defendant is responsible for the rent up to and through at least seven years.

12.    By reason of the foregoing, defendant is liable to the plaintiff for a base rent and additional rents.

13.    The defendant has breached its agreement with the plaintiff.

14.    By reason of the foregoing, defendant is liable to the plaintiff in the amount of Two Million Dollars ($2,000,000) plus costs and interest for the breach of the lease agreement.

15.    Defendant is also liable to the plaintiff for costs and attorneys' fees.

2

16.    By reason of the foregoing, plaintiff is entitled to recover all of his damages from the defendant.

WHEREFORE, plaintiff demands judgment against the defendant, to recover for all of its damages, all together with the costs and disbursements of this action.

JAROSLAWICZ & JAROS, LLC
Attorneys for Plaintiff
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780

By: _____

David Jaroslawicz

3

DAVID JAROSLAWICZ, a member of the firm of JAROSLAWICZ & JAROS, attorneys for the plaintiff(s) in the within action, duly admitted to practice in the Courts of the State of New York, affirms the following statements to be true under the penalties of perjury, pursuant to Rule 2016 of the CPLR:

That he has read the foregoing Complaint and knows the contents thereof; that the same is true to his own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters, he believes them to be true.

Affiant further states that the source of his information and the grounds of his belief are derived from the file maintained in the normal course of business of the attorneys for the plaintiff(s).

Affiant further states that the reason this affirmation is not made by the plaintiff(s) is that at the time this document was being prepared, the plaintiff(s) was (were) not within the County of New York, which is the County where the attorney for the plaintiff(s) herein maintains his office.

Dated:   New York, New York
         May 7, 2008

DAVID JAROSLAWICZ

# EXHIBIT A

# SHOPPING CENTER LEASE

*Jefferson City Shopping Center*
*Port Arthur, Texas*

between

## JEFFERSON CITY COMMONS, LLC, as Lessor

and

## MORAN FOODS, INC., as Lessee

Dated July 13th, 2007

# L E A S E

## *Jefferson City Shopping Center*
## *3513 Twin City Highway, Suite 22*
## *Port Arthur, TX*

THIS LEASE is made on the ___1st___ day of ___July___, 2007, between JEFFERSON CITY COMMONS, LLC, a Texas limited liability company ("Lessor"), and MORAN FOODS, INC., a Missouri corporation, d/b/a Save-A-Lot, Ltd. ("Lessee").

## ARTICLE 1. PREMISES

Section 1.1    Leased Premises and Shopping Center.    In consideration of the mutual covenants and agreements herein contained, Lessor hereby leases to Lessee the land and improvements existing thereon, or to be constructed thereon as hereinafter provided, situated in the Jefferson City Shopping Center at 3513 Twin City Highway, Suite 22, in the City of Port Arthur, County of Jefferson, and State of Texas, and outlined in red on Exhibit A hereto attached, consisting of a portion of a building approximately 19,141 square feet (hereinafter referred to as the "Leased Premises"), together with all appurtenances and the rights granted with respect to the Common Facilities (as hereinafter defined).   The entire tract of land shown outlined in blue on Exhibit A, of which the Leased Premises is a part, together with any additions thereto and all improvements existing or constructed thereon are hereinafter referred to as the "Shopping Center". The Shopping Center is legally described on Exhibit AA hereto attached.

## ARTICLE 2. TERM

Section 2.1    Original Term.   The term and Lessee's obligation to pay base rent and additional rent herein shall begin on the earlier of (i) the day Lessee opens for business with the public in the Leased Premises, or (ii) the one hundred twentieth (120th) day following the acceptance by Lessee of possession of the Leased Premises as provided for in Article 4 hereof (the "Commencement Date").   The term shall end on the last day of the seventh (7th) lease year. Within sixty (60) days after the beginning of the term, Lessee shall certify the beginning and ending dates of the term in a letter to Lessor.

Section 2.2    Options.   Lessee shall have the option to extend this Lease for three (3) successive extension terms of five (5) full lease years each, subject to the terms, covenants and provisions of this Lease.  Lessee may exercise each said option by giving Lessor written notice thereof no less than one hundred eighty (180) days prior to the beginning of each such period of extension.   The word "term" whenever used herein shall mean the original term and any extensions thereof unless the context otherwise requires.

Section 2.3    Lease Year.    The term "lease year" shall mean a period of twelve (12) consecutive months.  The first lease year shall begin on the date of the beginning of the term if such date occurs on the first day of a month; if not, then on the first day of the first month succeeding the beginning of the term.   Subsequent lease years shall run consecutively, each beginning on the first day of the month succeeding the completion of the previous lease year.

## ARTICLE 3. RENT

Section 3.1    Rent Payee.   Rent checks shall be made payable to Lessor and rent checks shall be mailed to **48 East Old Country #203, Mineola, NY 11501** until Lessee is otherwise notified

in writing by Lessor at least ten (10) days prior to the rent payment date on which the change in payee is to be effective. In the event that the Lessor's interest in this Lease shall pass or devolve upon another, or in the event that one other than the Lessor or the designated rent payee shall become entitled to collect the rent, then in any such event notice of the fact shall be given to the Lessee by the Lessor; or, if the Lessor is an individual and shall have died or become incapacitated, by the Lessor's executors, administrators or legal representatives, together with due proof of the status of such executors, administrators or legal representatives, and until such notice and proof the Lessee may continue to pay rent to the one to whom the last preceding installment of rent was paid and each such payment shall to the extent thereof fully exonerate Lessee. Notwithstanding the foregoing, (i) Lessee may, but in the absence of notice and proof given as above provided shall be under no obligation to pay rent to such one other than the Lessor, or the designated rent payee, who may become legally entitled to receive such rent; and (ii) Lessee shall be fully protected in acting upon any notice purporting to be signed by or on behalf of the one who should give such notice and believed by Lessee in good faith to be genuine.

Section 3.2     Base Rent.

A.     Lessee shall pay as base rent throughout the initial term the sum of **EIGHTY-SIX THOUSAND ONE HUNDRED THRITY-FIVE AND 50/100 DOLLARS ($86,135.50)** per lease year which shall be paid in equal installments of one-twelfth (1/12th) of said sum on or before the first day of each month of the initial term.

B.     Lessee shall pay as base rent the sum of **NINETY-FIVE THOUSAND SEVEN HUNDRED FIVE AND NO/100 DOLLARS ($95,705.00)** per lease year which shall be paid in equal installments of one-twelfth (1/12th) of said sum on or before the first day of each month of the first extension term, if exercised by Lessee.

C.     Lessee shall pay as base rent the sum of **ONE HUNDRED FIVE THOUSAND TWO HUNDRED SEVENTY-FIVE AND 50/100 DOLLARS ($105,275.50)** per lease year which shall be paid in equal installments of one-twelfth (1/12th) of said sum on or before the first day of each month of the second extension term, if exercised by Lessee.

D.     Lessee shall pay as base rent the sum of **ONE HUNDRED FOURTEEN THOUSAND EIGHT HUNDRED FORTY-SIX AND NO/100 DOLLARS ($114,846.00)** per lease year which shall be paid in equal installments of one-twelfth (1/12th) of said sum on or before the first day of each month of the third extension term, if exercised by Lessee.

Section 3.3     Pro Rata Base Rent.  Rent shall be reduced pro rata for any part of the lease year less than a full lease year and Lessee shall pay rent pro rata for that part, if any, of the term preceding the first lease year.

## ARTICLE 4. IMPROVEMENTS

Section 4.1     Leased Premises Improvements.   The Leased Premises are improved as a portion of an existing retail store building (hereinafter the "Building"). Lessor shall, at its expense, complete the work on Exhibit B (hereinafter referred to as the "LP Work"), which work shall be done in a lien-free, good and workmanlike manner, in compliance with all applicable codes and governmental requirements and in accordance with the specifications attached hereto as Exhibit B.

Section 4.2   Shopping Center.  Lessor covenants that all buildings in the Shopping Center shall be located wholly within the areas designated therefor on Exhibit A and that no building in the Shopping Center, including any rooftop equipment, shall be taller than one story or a maximum of 18 feet.  The sidewalks, driveways, alleys, landscaping, parking areas, service areas, including loading and unloading facilities, utilities to the point where they enter a building, Shopping Center signs and mall, if any, and other facilities of the Shopping Center designed for use by all occupants of the Shopping Center, including all easements, accesses or other rights benefiting the Shopping Center (even if not located on the Shopping Center) are herein together referred to as the "Common Facilities".

Section 4.3   Timing.  Lessor further agrees to complete the LP Work, and deliver actual exclusive possession of the Leased Premises to Lessee on or before the ninetieth (90th) day from the date of this Lease.  Lessee agrees to accept possession of the Leased Premises upon completion of the LP Work.  In no event shall the LP Work be deemed completed unless Lessor has furnished Lessee with a certificate of occupancy or certificate of completion, if one is available, upon completion of the LP Work and other permits necessary for Lessee's use of the Leased Premises except Lessee's business licenses.  If Lessor fails to complete the LP Work and tender actual exclusive possession of the Leased Premises to Lessee by said date and such failure continues for five (5) days after written notice of the failure by Lessee to Lessor, Lessee may, at its option, complete all or a portion of the LP Work and deduct the reasonable costs incurred from all rent and other charges due under this Lease.  If Lessor fails to complete the LP Work and tender actual exclusive possession of the Leased Premises to Lessee by said date and such failure continues for sixty (60) days after written notice of the failure by Lessee to Lessor, Lessee may, at its option, immediately cancel this Lease by notice in writing to Lessor, except for reasons which are beyond the reasonable control of Lessor as described below.  The date for completing the LP Work shall be deferred for a period equal to any delay caused by reason of labor controversy, act of God, fire or other casualty, governmental regulations or other cause beyond the reasonable control of Lessor, provided Lessor has from time to time in writing kept Lessee fully advised of such delays and the cause thereof.  Notwithstanding any delays, whether within or beyond the control of Lessor, if the LP Work has not been completed, the existing Farmer's Furniture lease terminated and actual exclusive possession of the Leased Premises tendered to Lessee on or before the date six (6) months from the date hereof, Lessee may cancel this Lease by notice in writing to Lessor given at any time thereafter prior to such completion and tender.

Section 4.4   Change Orders  Lessee may issue written change orders for the plans for the LP Work using the procedures provided herein.  Lessee shall provide written notice to Lessor of a proposed change order.  Within ten (10) days thereafter, Lessor shall provide written notice of the reasonable net, out-of-pocket costs incurred by Lessor as a result of the change order and any reasonable extension to the deadline for completion of the LP Work provided in Section 4.3 that would be reasonably required as a result of implementing the change order.  The change order shall not be effective until Lessee has delivered to Lessor written notice of its acceptance of the costs and time delay specified by the Lessor for implementing the change order.

Section 4.5   Lessee's Permit Contingency.  If Lessee is denied any building permit or other governmental approval, including without limitation a certificate of occupancy or certificate of completion, necessary to permit Lessee to make improvements to the Leased Premises that Lessee deems necessary to operate a retail food store and/or general merchandise store therein, then Lessee may cancel this Lease by notice in writing given to Lessor within ninety (90) days of the Execution Date.

Section 4.6    Fixturing.    Prior to completion of the LP Work and tender of actual exclusive possession of the Leased Premises to Lessee, Lessee may at its own risk enter upon the Leased Premises at such times as it deems appropriate to inspect the LP Work, make improvements thereon, install fixtures and other equipment, erect signs and stock merchandise and supplies, all without unreasonably interfering with the progress of the LP Work, and such acts by Lessee shall not be construed as acceptance of the Leased Premises by Lessee.

## ARTICLE 5.  MAINTENANCE, REPAIRS AND UTILITIES

Section 5.1    Lessee's Obligations.    With respect to the improvements on the Leased Premises, Lessee agrees, at its sole expense, to:

(a)    Make all repairs necessitated by the negligence or intentional acts of Lessee, its agents, contractors and employees;

(b)    To the extent not covered by warranty, provide ordinary maintenance of the heating, air-conditioning and air cooling equipment and make minor replacements and repairs incidental thereto (for the purposes hereof, incidents of repair and/or replacement costing less than $1,500.00 per incident shall be deemed "minor"). Lessee shall obtain and maintain in full force and effect a standard maintenance service contract on the heating, air-conditioning and air-cooling equipment serving the Leased Premises;

(c)    Pay for all water, fuel, gas, electricity and other utilities used by it, as measured by separate meters to be provided by Lessor (at its sole cost and expense);

(d)    Replace all plate glass or doors broken or damaged not required to be replaced by the Lessor; and

(e)    Perform other routine maintenance of the interior of the Leased Premises not required to be made by Lessor;

except that any repairs, replacements or restorations made necessary by reason of fire or other casualty shall be completed in accordance with the terms of Article 7.

Section 5.2    Lessor's Obligations. Lessor agrees, at its sole expense, to:

(a)    Make all necessary repairs and provide maintenance to the exterior portions and structural portions of the Building, including but not limited to roofs, foundations, gutters, structural walls and canopies, but excluding exterior doors and Lessee's signs; and to repaint all exterior painted portions of the Building when necessary but in no event less than once every five (5) years in such color(s) as Lessee designates;

(b)    To the extent not covered by warranty, make all necessary repairs and replacements of the heating, air-conditioning and air cooling equipment serving the Building not required to be made by Lessee;

(c)    Provide adequate connections with the local water supply, sewerage systems, gas, electrical and other utilities; maintain all said systems and lines to the point where they enter the Building and provide separate meters for measuring Lessee's use;

(d)      Replace all plate glass or doors broken or damaged prior to the delivery of the Leased Premises to Lessee; and

(e)      Make all alterations, repairs and replacements, interior and exterior, to the Building when necessary as a result of faulty construction or Lessor's failure to promptly discharge its obligations under subsections (a), (b), (c) or (d) hereof.

Section 5.3    Warranties.  Lessor shall assign or cause its beneficiaries to assign to Lessee any claims against any contractor, supplier or other person for breach of contract or warranty relating to any construction, remodeling, alteration or reconstruction of the Building insofar as Lessee is herein obligated to maintain, repair or replace same and shall permit Lessee in its discretion and at its expense to take legal action against such person or persons in the name of Lessor.  Lessor shall cooperate fully with Lessee in asserting any such claim, and if any damages or other payments are received by Lessor as a result of such claim, Lessor shall pay the same over to Lessee.

Section 5.4    Common Facilities.  Lessor shall maintain the Common Facilities in good order, appearance and repair in a manner typically provided for in a shopping center comparable to the Shopping Center (including but not limited to all necessary patching, resurfacing and restriping of the parking areas), provide adequate lighting thereof, and promptly remove all snow, dirt and debris therefrom.

Section 5.5    Fees.  Lessor shall pay all permit and inspection fees relating to the Leased Premises or the Shopping Center (including without limitation driveway fees) imposed by governmental authorities, except fees relating to Lessee's business, improvements and signs.

Section 5.6    Performance.  All maintenance, alterations, repairs and replacements shall be begun and completed within a reasonable time.  Any of such work to be performed by Lessor shall be done so as to reasonably minimize inconvenience to the operation of the Lessee's business on the Leased Premises.

Section 5.7    Lessor's Representations.  Lessor represents and warrants to Lessee that as of the beginning of the term of this Lease, (a) there is no material adverse fact relating to the physical condition of the Common Facilities or the Building which has not been disclosed in writing to Lessee; (b) all HVAC and other equipment associated with the Building shall be in good working order; and (c) it has no knowledge of any proposed plans for the widening of any street adjacent to the Shopping Center or for any other public projects or public works affecting the Shopping Center.

## ARTICLE 6. USE, COMMON FACILITIES, ALTERATIONS AND FIXTURES

Section 6.1    Use.  The Leased Premises may be used for a grocery store, supermarket, or limited assortment food store selling food/grocery items and general merchandise (at a single price point or otherwise), and any other uses that may be incidental to such a grocery store, supermarket, or limited assortment food store from time to time (such as, but not limited to, video department or pharmacy department), or otherwise generally deal in any and all articles of food, food products, grocery products, household products and general merchandise (at a single price point or otherwise), including the sale or rental of such products and services as may be sold or rented from time to time by such a grocery store, supermarket, or limited assortment food store (the "Intended Use").  The Leased Premises may also be used for any other lawful purpose, provided such use does not violate the exclusive use of another tenant in

the Shopping Center set forth on Exhibit E (unless such restriction has expired under the terms of such tenant's existing lease or due to the termination or expiration of such tenant's existing lease).

Lessor hereby grants to Lessee, its employees and invitees, without charge: (a) the right to use in common with the other tenants and occupants of the Shopping Center and their respective employees and invitees, all of the Common Facilities, including the express grant to Lessee of the right and authority, at Lessee's sole discretion, to police the Common Facilities to prevent or cause to be removed from the Common Facilities persons engaging in solicitation, distribution, picketing, petitioning, hand billing or any other activity which Lessee believes could create a disturbance, deter customers, threaten safety, impede or interfere with the business operations of Lessee or the smooth flow and free passage of employees and invitees to the Leased Premises, provided that Lessee shall not be obligated to take, and shall have no liability for not taking, any action against such persons; and (b) the exclusive right to use (i) that portion of the service areas designed for use with the Leased Premises, including any loading and unloading facilities; and (ii) reasonable portions of the sidewalks and parking lot adjacent to the Leased Premises for storage of shopping carts and the display and sale of merchandise.

Section 6.2    Use of Common Facilities.  Lessor agrees that (a) the Common Facilities shall be maintained by Lessor solely for the convenience and use of Lessee and the other tenants and occupants of the Shopping Center and their respective employees and invitees, and it shall not grant any rights with respect to the Common Facilities or permit the use thereof by any persons other than the tenants and occupants of the Shopping Center, their employees and invitees; (b) it shall provide all of the Common Facilities for such use at all times, except during reasonable periods of time required to provide necessary maintenance or repairs; (c) it shall not change the Common Facilities located within the "No-Build Area" shown cross-hatched on Exhibit A in any manner without the prior written consent of Lessee; provided such building does not exceed 2,400 square feet in size or 18 feet [including rooftop equipment] in height), and (d) it shall require all tenants and occupants of the Shopping Center and their employees to park their automobiles in a portion of the parking area reasonably designated for such purpose, which area shall be located in the part of the Shopping Center least likely to be used by the customers of Lessee and other tenants and occupants of the Shopping Center.  Lessor may build other structures on the parking lot located outside of the No-Build Area, so long as such structures are legal and do not materially block the view or access to the Leased Premises.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, LESSEE SHALL NOT HAVE ANY OBLIGATION, EXPRESS OR IMPLIED, TO OPEN ANY BUSINESS AT THE LEASED PREMISES, TO REMAIN OPEN FOR BUSINESS IN THE EVENT A BUSINESS IS OPENED AT THE LEASED PREMISES, TO REOPEN FOR BUSINESS IN THE EVENT A BUSINESS IS OPENED AT THE LEASED PREMISES AND THEN CLOSES, OR OTHERWISE TO CONDUCT ANY BUSINESS AT THE LEASED PREMISES.

Section 6.3    Use Restrictions.  Lessor agrees that no portion of the Shopping Center, except for the Leased Premises as to Section 6.3(a), shall be used or operated:

(a)    as a supermarket or other store, or department within a store, for the sale of food, groceries, fruit, produce, dairy products, vegetables, bakery products, or meats; or

(b)    as an adult bookstore, massage parlor, or any other establishment which provides live adult entertainment or which sells, rents or exhibits pornographic or obscene materials, as an abortion clinic, flea market, or vehicle sales; or

(c)    within two hundred fifty (250) feet of the Leased Premises as a nightclub (not including establishments with live music and dancing which operate primarily as restaurants) or discotheque, off-track betting business or store selling strictly firearms or ammunition.

(d)    Further, no portion of the Shopping Center located to between and including the premises numbered twenty-three (23) and seventeen (17) on Exhibit A shall be used or operated as a movie theatre, tire store and service facility with service bays, or so-called "call center".

The restrictions in Section 6.3(a) shall not apply to (i) the following existing tenants (their successors and assigns; provided that Lessor agrees to withhold its consent to any assignment, sublease or change in use, which would conflict with the exclusive use granted to Lessee herein, except existing use): Port Arthur Bingo, Dollar General, Citi Trends, Ramirez Imports, Texas State Optical, Naomi Fashions, Moon Palace, Sav-On Office Supplies, One Stop Beauty, Beauty Salon, Sarah's Bakery, Rainbow Apparel, Sun Loan Company, Side Pocket, Affordable Furniture, Colors for Men, Dollar Supreme, Biomat USA, Inc., Burke's Outlet, La Morenita Meat Market, Radio Shack, EZ Pawn, Texas State Bank, Burger King, Paradise Café, Ice Cream Store, for so long as such tenant is operating in its existing premises under its existing lease and for the purposes already permitted in its existing lease; (ii) restaurants (including fast food restaurants, delicatessens, eat in restaurants and take out restaurants) from selling prepared foods for on and off premises consumption; (iii) discount general merchandise stores such as, but not limited to, stores such as Family Dollar, Dollar Tree and Big Lots; provided that not more than 150 linear feet of total shelving area (including coolers and freezers) shall be used for the sale/display of food items for off-premises consumption and not more than two 4-foot coolers and one 4-foot freezer for the sale/display of food items for off-premises consumption; or (iv) the selling of food items as incidental to a tenant's primary use. For purposes hereof, the term "incidental" shall mean that not more than ten (10) linear feet of total shelving area may be devoted to the sale/display of food items. Notwithstanding the foregoing, in no event shall any portion of the Shopping Center (except for the Leased Premises and the existing La Morenita Meat Market, its successors and assigns, for so long as such La Morenita Meat Market (or its successors/assigns) is operating in its existing premises under its existing lease and for the purposes already permitted in its existing lease) be used for the sale or display of fresh fruit and produce, fresh butchered or case-ready meat, poultry or fish products.

In the event of breach of any restrictions contained within this Section, then all rents and other charges to be paid by Lessee under this Lease shall abate by fifty percent (50%) until such violation is corrected. If such violation continues for a continuous period of one hundred eighty (180) days after Lessee sends written notice to Lessor of such violation, Lessee may terminate this Lease by sending Lessor an additional written notice at any time after said 180-day period while said violation continues. Lessee shall also be entitled to seek injunctive relief, in addition to any other rights or remedies available to Lessee pursuant to applicable law or this Lease.

Section 6.4    Zoning.  Lessor warrants that there is no zoning law, ordinance or regulation prohibiting the use of the Leased Premises for the Intended Use (defined in Section 6.1), nor prohibiting the use of the Common Facilities for accessory automobile parking, signs, and service facilities as herein permitted or required. If any such existing or future zoning law, ordinance or regulation is enforced so as to prohibit such use of the Leased Premises or Common Facilities, Lessee may cancel this Lease by giving Lessor not less than ten (10) days' written notice.

Section 6.5    Deliveries.  If at any time the access by semi-trailer trucks (with 58' trailers) or other delivery vehicles to or from the service doors of the Building and the adjacent streets and alleys is prevented or materially impeded for any reason beyond Lessee's reasonable control and as a result thereof Lessee discontinues or is prevented from conducting a retail business in the Leased Premises, then all rents and other charges to be paid by Lessee under this Lease shall abate until such access is again permitted.  If such access preclusion continues for a period of thirty (30) days, Lessee may terminate this Lease by notice in writing to Lessor at any time thereafter while said condition continues.

Section 6.6    Private Restrictions.  Lessor covenants that Lessee will not be prevented from or restricted in using the Leased Premises for the Intended Use (defined in Section 6.1) or in rendering any services on the Leased Premises nor in exercising the rights herein granted with respect to the Common Facilities because of any restriction, covenant or agreement entered into by any person having or having had an interest in the Leased Premises or the Shopping Center.  If Lessee is prevented from or restricted in so using the Leased Premises or in exercising said rights because of any court order or other judicial determination arising out of any such restriction, covenant or agreement, the rents and other charges to be paid by Lessee under this Lease shall abate during the period Lessee is so prevented from or restricted in using the Leased Premises or exercising said rights; and if said period shall continue for ninety (90) days or more, Lessee may terminate this Lease by notice in writing to Lessor at any time thereafter during said period.  From and after the execution and delivery hereof, Lessor shall defend, indemnify and save harmless Lessee against all actions, claims, costs (including reasonable attorney's fees) and loss arising out of the existence of any such restriction, covenant or agreement or allegation thereof.

Section 6.7    Lessor's Alterations.  Lessor shall at its expense from time to time make any alterations, improvements or additions to the Leased Premises that may be required on account of any existing or future laws, ordinances or regulations of lawful authority except alterations, improvements or additions to the Leased Premises as may be required solely by reason of the nature of Lessee's business.  If because of any such law, ordinance or regulation, Lessee is deprived of the use of the Leased Premises, the rents and other charges to be paid by Lessee under this Lease shall abate during the period of such deprivation.

Section 6.8    Lessee's Alterations.  Lessee may at its expense from time to time make any non-structural alterations, changes or improvements in, on and to the Leased Premises which it may deem necessary or desirable.  Lessee may make structural changes to the Leased Premises with the approval of Lessor which approval shall not be unreasonably withheld or delayed, provided that the changing or addition of interior partition walls, plumbing, electrical, and other lines shall not be deemed structural changes.  Lessee shall not be required to, but may, remove any such alterations, changes or improvements at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise, provided Lessee shall repair any damage caused by such removal.

Section 6.9    Liens.  Lessee shall keep the Leased Premises free from any mechanics or materialmen's liens for any labor or material furnished Lessee in connection with the Leased Premises, except that Lessee shall have the right to contest the validity or amount of any such lien.

Section 6.10    Fixtures.  Any fixtures, equipment, signs or other property, however attached to or incorporated in the Leased Premises or the Shopping Center, belonging to the Lessee or its subtenants or licensees are to be and remain their property, and they shall have the right to

remove them at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise, provided Lessee shall repair any damage caused by such removal.

Section 6.11    Signs.  Lessee shall have the exclusive right to place signs and advertisements on the exterior and interior of the Leased Premises including the walls and canopy of the Building, provided that during the last three (3) months of the term Lessor may place a "For Rent" or "For Sale" sign not in excess of 2' x 3' in size on any portion of the exterior of the Leased Premises other than on the plate glass or in any place obstructing Lessee's signs.  In the event any sign in the Shopping Center, other than the signs on the individual store facades, bears any name or advertisement other than that of the Shopping Center as a whole, Lessee shall have the right to place its name and/or advertising on a prominent position on such sign. Lessee's panel position on the existing Shopping Center pylon sign (located between the buildings numbered twenty-five (25) and twenty-seven (27) on the attached Exhibit A) shall be the top panel.  Lessee shall have the right to place and display pole banners in a place in the Common Facilities selected by Lessor .  Lessor hereby agrees that all such signage may be changed from time to time without the consent of Lessor in order to conform such signage to any then existing standard signage of Moran Foods, Inc., or any of its franchisees or licenses, or any other entity affiliated with Moran Foods, Inc.  Lessor hereby pre-approves Lessee's sign criteria (including pole banners) attached hereto as Exhibit F.

Section 6.12    Vending Machines.  Notwithstanding anything to the contrary contained herein, Lessee shall be entitled, at its expense, to install and operate within or adjacent to the exterior of the Leased Premises, or to cause to be installed and operated within or adjacent to the exterior of the Leased Premises, vending machines, postage machines and/or any and all machines or devices used by the public and operated through the use of coins, tokens, credit cards or similar means (the "Vending Machines") but not more than ten (10) such machines. Lessee, or its subtenants, designees or licensees, or the actual owners of the Vending Machines, as the case may be, shall have the sole right to collect and retain any and all profits and receipts from such Vending Machines, and Lessor shall have no right to any such Vending Machines or to any of the receipts or profits generated therefrom.  For the purposes hereof, any Vending Machines installed or caused to be installed within or adjacent to the exterior of the Leased Premises shall be and remain the property of Lessee or its subtenants, designees or licensees, or the actual owners of the Vending Machines, as the case may be, and such Vending Machines shall be subject to removal by them at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise.  All utilities for machines under this Section 6.12 shall be at the sole obligation, expense and cost of the Lessee.

Section 6.13    Cart Theft Deterrence System.  Lessee shall have the right, at Lessee's sole cost and expense, (i) to install a cart theft deterrence system in a place in the Common Facilities selected by Lessee with Lessor's consent (not to be unreasonably withheld, conditioned or delayed) and (ii) to use reasonable portions of the Common Facilities to install signs and markings relating to Lessee's use of such system. Lessee shall complete any and all work necessary to install the cart theft deterrence system in a good and workmanlike manner, in accordance with all applicable governmental codes, ordinances and regulations, and without unreasonably interfering with the use and operation of the Shopping Center. Lessee shall not be required to, but may, remove the system at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise, provided Lessee shall repair any damage caused by such removal. If the cart theft deterrence system remains in the Shopping Center ten (10) days following the termination of this Lease by lapse of time or otherwise, such

system shall be deemed part of the Shopping Center and shall be surrendered with the Leased Premises by Lessee.

## ARTICLE 7. RESTORATION

Section 7.1    Hazard Insurance.  Lessor shall carry, with a reputable insurance company that is licensed to do business in the state where the Leased Premises are located and that is listed in Best's Insurance Reports as having a quality rating of not less than B+ (provided such a rating is available for insurance offered in the State of Texas in this locale), insurance on a "Comprehensive Replacement Cost Form" with a face amount equal to one hundred percent (100%) of the replacement value of the insured property, with a standard co-insurance endorsement of not more than ninety percent (90%), and with a deductible of no more than $50,000 against loss or damage resulting from fire and other insurable casualties.  The property insurance shall cover and insure all buildings and improvements in the Shopping Center, including the Leased Premises.  Lessor agrees that the proceeds of the insurance required by this Section 7.1 shall be used, to the extent necessary, to pay for the repairs and restorations required to be completed by Lessor under the terms of this Article 7.  Before the beginning of the term of this Lease, Lessor shall deliver to Lessee a certificate of insurance that evidences the existence of the insurance required under this Section 7.1.  After the commencement date and continuing until the expiration or earlier termination of this Lease, upon request by Lessee, Lessor shall deliver to Lessee a replacement certificate or a renewal certificate at least 30 days before the insurance required under this Section 7.1 is to expire.

Section 7.2    Release of Claim; Subrogation.

(a)    Lessor hereby releases and discharges Lessee, its subtenants, licensees and their agents and employees of and from all liability to Lessor and to anyone claiming by, through or under Lessor on account of any loss or damage resulting from or arising out of any fire or other casualty, however caused, excepting only if caused by the intentional acts of said Lessee, its agents, servants or employees.

(b)    Lessee hereby releases and discharges Lessor, its tenants, licensees and its agents and employees of and from all liability to Lessee and to anyone claiming by, through or under Lessee on account of any loss or damage resulting from or arising out of any fire or other casualty, however caused, excepting only the intentional acts of Lessor, its agents, servants or employees.

Section 7.3    Restoration.  If the Leased Premises is damaged or destroyed by fire or other casualty, Lessor shall at its expense repair and restore the Leased Premises so as to be substantially the same as prior to such damage or destruction.  Lessor shall begin such repairs or restoration within ninety (90) days from the date Lessor settles the insurance proceeds from the insurance maintained by Lessor under Section 7.1 and shall complete said repairs or restoration within one hundred eighty (180) days from the date Lessor is obligated to commence said repairs or restoration.  Lessor shall diligently and in good faith prosecute the claim for such insurance proceeds to completion and shall use its reasonable efforts to obtain such insurance proceeds as soon as possible.  The dates by which Lessor is to begin and complete said repairs or restoration shall be deferred for a period equal to any delay caused by reason of labor controversy, act of God, fire or other casualty, governmental regulations or other cause beyond the reasonable control of Lessor, provided Lessor has from time to time in writing kept Lessee fully advised of such delays and the cause thereof.  If any other building(s) in the Shopping

Center is (are) damaged or destroyed by fire or other casualty, Lessor shall promptly either repair and restore or raze the building.

Notwithstanding the other provisions of this Section 7.3 and 7.4, in the event that more than fifty percent (50%) of the so called "in line" buildings in the Shopping Center shall be destroyed by fire or other casualty, and Lessor is not going to repair or restore such "in line" buildings in the Shopping Center as retail space, Lessor shall have the right to terminate this Lease by giving written notice of such termination within thirty (30) days of the date of such casualty effective as of the date of such termination notice (which termination notice shall include Lessor's representation and warranty to Lessee that Lessor is not going to repair or restore such "in line" buildings in the Shopping Center as retail space), provided that Lessor must, simultaneously therewith, terminate all other leases for the "in line" buildings in the Shopping Center.

Section 7.4     Last Two Years.  If the Leased Premises is damaged or destroyed by fire or other casualty during the last two (2) lease years of the term prior to the last date by which Lessee may exercise an option to extend the then current term and the cost of repairing or restoring the Leased Premises as required by Section 7.3 herein will exceed twice the rent per lease year, then Lessee shall have the option of terminating the Lease which may be exercised by written notice to Lessor within sixty (60) days after certification by Lessor to Lessee of its reasonable estimate of the cost of repairing or restoring the Leased Premises.  If Lessee does not so terminate, Lessor shall have the option of requiring Lessee to decide whether to extend the then current term by exercising said option to extend the term for five (5) lease years or whether this Lease shall be terminated.   Such option may be exercised by Lessor's giving Lessee written notice thereof within thirty (30) days after such fire or casualty.  Within thirty (30) days after Lessee receives said notice, Lessee shall notify Lessor in writing whether it exercises said option and in the absence of such notice exercising said option this Lease shall terminate. Any notice by Lessee exercising said option following such notice from the Lessor shall be effective notwithstanding the fact that the last day by which Lessee otherwise had to exercise said option occurs subsequent to the date of such fire or other casualty.  If such fire or other casualty occurs during the last two (2) years of the last option period or after the last date by which Lessee may exercise said option and Lessee has not exercised said option, then Lessor may terminate this Lease by notice in writing to Lessee given within thirty (30) days after such fire or other casualty.

Section 7.5     Rent Abatement.  If damage or destruction to the Building results in the total suspension of business in the Leased Premises or if damage or destruction to the Shopping Center reasonably results in total suspension of business in the Leased Premises, all rents and other charges payable by Lessee under this Lease shall abate from the date of such suspension of business until the earlier of (i) the date such business is resumed, or (ii) the date thirty (30) days following the completion of said repairs or restoration.  If such damage or destruction or the work of repairing or restoring said improvements results in only a partial suspension of business, the abatement shall be apportioned accordingly.

Section 7.6     Failure to Restore.  If Lessor fails to begin or complete the repairs or restoration of the Building within the times and in the manner provided for in this Article 7, then Lessee may, in addition to any other remedies it may have, (i) terminate this Lease by notice in writing to Lessor at any time prior to said beginning or completion, as the case may be, or (ii) Lessee may perform said repairs or restoration or so much of them as it deems necessary or desirable and may recoup said costs by deducting said costs from all rents and other charges due thereafter.

## ARTICLE 8. EMINENT DOMAIN

Section 8.1    Total.  If the entire Leased Premises is taken under the power of eminent domain, this Lease shall terminate on the date Lessee is deprived of possession pursuant to such taking.

Section 8.2    Partial.  If under the power of eminent domain, any part of the Leased Premises, or any part of the service areas accessory to the Leased Premises, or any part of the parking area outlined in orange, if any, on Exhibit A, is taken, or twenty percent (20%) or more of the total parking area in the Shopping Center is taken or if any access to the Shopping Center is taken by one or more takings, then, in any such event, Lessee may terminate this Lease by giving Lessor no less than ten (10) days' written notice thereof at any time after the date of such taking and before the expiration of ninety (90) days from the date Lessee is deprived of its right to use said portion of Building or the Common Facilities, as the case may be, pursuant to such taking.  Notwithstanding the foregoing, before exercising its right to terminate this Lease as set forth herein above, in the event any access to the Shopping Center is taken by one or more takings, Lessee agrees to first negotiate with Lessor in good faith to determine a mutually acceptable location for Lessor to construct a new point of access to the Shopping Center, which location shall not adversely affect Lessee's business.

Section 8.3    Restoration.  If a portion of the Leased Premises or Common Facilities is so taken and this Lease is not terminated therefor, the remainder of the Leased Premises or Common Facilities shall be restored by Lessor as soon as possible.

Section 8.4    Rent Abatement.  In the event of a partial taking as contemplated by Section 8.2, all rents and other charges payable by Lessee under this Lease shall be reduced from and after the date Lessee is deprived of possession of such portion of the Leased Premises in proportion to the floor area of the Leased Premises so taken.  In addition, if any such taking results in the suspension of business in the Leased Premises, all rents and other charges payable by Lessee under this Lease shall abate from the date of such suspension of business until the earlier of (i) the date such business is resumed, or (ii) the date thirty (30) days following the completion of said restoration by Lessor.

Section 8.5    Settlement.  For the purpose of this Article 8, a taking under the power of eminent domain shall include conveyances or dedications made in settlement of or in lieu of condemnation proceedings.

Section 8.6    Award.  Lessee and not Lessor shall be entitled to any portion of the award made to Lessee or Lessor for the value of Lessee's trade fixtures, leasehold improvements (except if completed by Lessor), business interruption and/or relocation expenses.  All compensation awarded for the taking of the Building, the fee and the leasehold shall belong to and be the property of Lessor, and Lessee shall not be entitled to any damages for the unexpired portion of the term of the Lease or injury to its leasehold interests except as provided for above.  Lessee shall have no claim against Lessor for the value of any portion of the unexpired term of this Lease; and Lessor shall have no obligation to include Lessee in any such claim.

## ARTICLE 9. INDEMNITIES AND INSURANCE

Section 9.1    Lessee's Indemnity.  Lessee shall defend and indemnify the Lessor, its agents and employees, against any liability, claim of liability and expense incurred as a result of the liability or claim of liability (including reasonable attorney's fees) whether for death, injury to persons or damage to property (i) occurring on or arising out of the use of the Leased Premises during the term hereof except if caused by any act or omission to act by Lessor, its licensees or contractors, their agents or employees, (ii) arising out of any default by Lessee under this Lease; or (iii) arising out of any act or omission to act by Lessee, its agents, contractors or employees on the Common Facilities at any time or on the Leased Premises prior to the beginning of the term; all subject to the provisions of Section 7.2 hereof.

Section 9.2    Lessor's Indemnity.    Lessor shall defend and indemnify the Lessee, its subtenants, licensees and concessionaires, their agents and employees, against any liability, claim of liability and expense incurred as a result of the liability or claim (including reasonable attorney's fees) whether for injury to persons, including death, or damage to property (i) occurring on the Leased Premises prior to the beginning of the term hereof except if caused by any act or omission to act by Lessee, its licensees, concessionaires or contractors, their agents or employees, or occurring on the Leased Premises during the term if caused by any act or omission to act by Lessor, its licensees or contractors, their agents or employees; (ii) arising out of any default by Lessor under this Lease; or (iii) occurring on the Common Facilities, except if caused by any act or omission to act by Lessee, its subtenants, licensees, concessionaires or contractors, their agents or employees.

Section 9.3    Insurance.  Each of Lessor and Lessee shall, prior to the commencement of any construction or reconstruction by the applicable party in relation to the Leased Premises or the Shopping Center premises or prior to the commencement of the term, whichever is earlier, procure and maintain, or cause to be procured and maintained, an insurance policy in a form and from an insurer reasonably acceptable to the other party covering (i) liability with respect to any construction or reconstruction that the applicable party may perform or have performed in, upon or in connection with the Leased Premises and the Shopping Center premises; (ii) liability for ownership, maintenance and use of the Leased Premises (as to the Lessee) and the Shopping Center (as to the Lessor); and (iii) the party's contractual liability arising under Section 9.2 or Section 9.1.  Lessor and Lessee may satisfy the obligation to procure and maintain such liability insurance policies with respect to any such construction or reconstruction by requiring its general contractor to procure and maintain such liability insurance and such liability insurance with respect to any such construction or reconstruction shall provide a combined single limit of not less than Two Million Dollars ($2,000,000), of which up to One Million Dollars ($1,000,000) may be maintained with so-called "umbrella liability coverage".  Each of such insurance policies with respect to liability for ownership, maintenance and use of the Leased Premises (as to the Lessee) and the Shopping Center (as to the Lessor) and with respect to each party's respective contractual liability arising under Section 9.2 or 9.1 shall provide a combined single limit of not less than One Million Dollars ($1,000,000.00) per occurrence with no general aggregate or a general aggregate of not less than Two Million Dollars ($2,000,000.00).  All of such liability insurance policies shall provide coverage on an "occurrence basis" and shall name as insureds or additional insureds each of the parties hereto. Lessor and Lessee shall each furnish the other with copies of the policy, or certificates or memoranda thereof.  Lessee and Lessor reserve the right to provide coverage under a so-called blanket policy.  Lessee reserves the right to self-insure so long as Lessee maintains a net worth of at least $50,000,000.00 as certified by a financial officer of Lessee upon the written request of Lessor.

## ARTICLE 10. TITLE AND POSSESSION

Section 10.1   Possession. Intentionally Deleted.

Section 10.2   Quiet Enjoyment.  Lessor covenants that if the Lessee shall perform all of the covenants and provisions of this Lease to be performed by the Lessee, the Lessee shall peaceably and quietly occupy and enjoy the full possession and use of the Leased Premises and the use of the Common Facilities as herein provided.  If at any time Lessor's title shall fail or Lessor is unable to grant rights to the Common Facilities as provided in this Lease, Lessee may at its option cancel this Lease by notice in writing to Lessor.

Section 10.3   Assignment and Subletting.  Lessee may from time to time (without the consent of Lessor) assign or reassign this Lease or sublease the whole or any part of the Leased Premises to any person, firm or corporation that is a franchisee or licensee of Lessee or to a corporation which is subsidiary or parent company to or affiliated with Lessee, or a corporation resulting from any reorganization or merger to which Lessee, its parent company or any of its subsidiaries or affiliates may be a party, or due to a change in ownership or control (the "Permitted Assigns"), provided that Lessee shall remain primarily liable for the performance of all of its obligations under this Lease.  Lessee agrees to give Lessor prompt written notice following any such assignment of this Lease or subletting of the Leased Premises.  Any assignee or subtenant shall be subject to all the terms of this Lease.  Except for the Permitted Assigns, Lessee shall not be entitled to assign this Lease or sublet all or any portion of the Leased Premises without Lessor's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  In the event of any assignment or subletting, Lessee shall remain primarily liable for the performance of all of its obligations under this Lease.

If Lessee desires to assign this Lease or sublet all of the Leased Premises to any party (specifically excluding the Permitted Assigns) and Lessor's consent is required, Lessee shall send a written notice (hereinafter called Lessee's Notice of Assignment") advising Lessor of Lessee's intention to assign this Lease or sublet all of the Leased Premises.  Lessor shall have a period of thirty (30) days after receipt from Lessee of Lessee's Notice of Assignment to terminate this Lease and recapture the Leased Premises with no further obligations thereafter accruing from Lessor to Lessee, such termination to be effective thirty (30) days after receipt of Lessor's termination notice or to advise Lessee that Lessor consents or reasonably refuses to consent (specifically stating the reasons for such refusal) to such proposed sublease or assignment.  In the event that that Lessor elects to terminate this Lease and recapture the Leased Premises, Lessee shall have the right to withdraw its proposal or vacate and surrender possession of the Leased Premises no later than thirty (30) days from the date of Lessor's termination notice or such other period of time mutually agreed to by the parties.

Lessee may not sublease or assign this Lease to any party that would use the Leased Premises in violation of the use provisions of Section 6.1 of this Lease.

Section 10.4   Title And Authority.

(a)     Lessor represents to Lessee that it has good title to the Leased Premises and the Shopping Center in fee simple, subject only to interests not conflicting with the rights herein granted to Lessee.  Lessor also represents to Lessee that there are no contracts, leases or other agreements of any kind which adversely affect or limit Lessee's use of the Leased Premises or the Common Facilities in accordance with the terms of this Lease.

(b)    Lessor represents to Lessee that (i) by entering into this Lease and leasing the Leased Premises to Lessee, Lessor will not breach or violate any other covenants, contracts, leases or other agreements of any kind to which Lessor is a party or breach or violate any judgment, order, or decree of any court or arbiter that is binding on Lessor or upon the Shopping Center, and (ii) Lessor has full right, power and authority to enter into this Lease and to perform the obligations of Lessor hereunder.

(c)    Lessee represents to Lessor that (i) by entering into this Lease and leasing the Leased Premises from Lessor, Lessee will not breach or violate any other covenants, contracts, leases or other agreements of any kind to which Lessee is a party or breach or violate any judgment, order, or decree of any court or arbiter that is binding on Lessee, and (ii) Lessee has full right, power and authority to enter into this Lease and to perform the obligations of Lessee hereunder.

(d)    Lessor shall indemnify and defend Lessee against any and all loss, cost, damage, claim, liability and expense of any kind whatsoever (including attorneys' fees, experts' fees, court costs, costs of investigation, and settlement costs), incurred by Lessee, or any officer, director or employee of Lessee, arising out of, resulting from or relating to (i) any breach by Lessor of any of Lessor's representations or warranties contained in this Lease, and/or (ii) any representation or warranty of Lessor in this Lease being false, inaccurate or misleading.

(e)    Lessee shall indemnify and defend Lessor against any and all loss, cost, damage, claim, liability and expense of any kind whatsoever (including attorneys' fees, experts' fees, court costs, costs of investigation, and settlement costs), incurred by Lessor, or any officer, director or employee of Lessor, arising out of, resulting from or relating to (i) any breach by Lessee of any of Lessee's representations or warranties contained in this Lease, and/or (ii) any representation or warranty of Lessee in this Lease being false, inaccurate or misleading.

Section 10.5   Subordination.  Lessor agrees to deliver to Lessee prior to the beginning of the term of this Lease, a written agreement, in substantially the form attached hereto as Exhibit C, from the holder of any deed of trust, trust deed or mortgage which has priority over this Lease that such holder will not disturb the rights of Lessee under this Lease so long as Lessee is not in default of this Lease. If Lessor fails to deliver such an agreement, Lessee may terminate this Lease by written notice to Lessor.   Provided the Lessor is not in default, Lessee agrees to subordinate this Lease to any deed of trust, trust deed or mortgage which may hereafter be placed on the Leased Premises or the Shopping Center premises, provided such trustee or mortgagee thereunder shall agree, in substantially the form attached hereto as Exhibit C, that it will not disturb Lessee's right to possess the Leased Premises and other rights under this Lease so long as Lessee is not in default of this Lease.

Section 10.6   Memorandum of Lease.  At the request of either party, the parties shall execute a memorandum of this Lease in recordable form, in the form attached hereto as Exhibit D, stating the term of the Lease, the parties hereto and any use restrictions contained in this Lease. Except for such memorandum, this Lease will not be recorded.

Section 10.7   Estoppels.  Each party shall, within thirty (30) days after written request from the other party (but not more often than twice in any 12 month period), execute and deliver to the other party a certificate stating (a) that the Lease is in full force and effect, if such be the case, (b) the date of this Lease and any amendments thereto, (c) that the certifying party has not given or received a notice complying with the notice provisions in this Lease relating to a default which has not yet been cured, or providing details as to any outstanding default notice, (d) the date to which rent has been paid, and (e) the expiration date of the then current term of this Lease and the number of renewal periods remaining.  Such certificate shall be in substantially the form as that attached hereto as Exhibit G.

## ARTICLE 11.  ADDITIONAL RENT

Section 11.1  Taxes.  Lessor shall pay all taxes levied or assessed against the Shopping Center premises before they become delinquent and the parties further agree as follows:

(a)    As additional rent, Lessee shall pay to Lessor an amount equal to the "Taxes" for each calendar year of the term except that the amount to be paid by Lessee with respect to the calendar years during which the term begins and ends shall be adjusted pro rata on the basis of the number of days of the term falling within each of said calendar years.  If the base rent abates or is apportioned for any reason, the amounts due pursuant to this Section shall similarly abate or be apportioned.  Notwithstanding anything to the contrary, the total amount payable by Lessee for Taxes for the first lease year of this Lease shall not under any circumstances exceed a total of Five Thousand Seven Hundred Forty-Two and 32/100 Dollars ($5,742.30).

(b)    "Taxes" shall mean a pro rata share of the general real estate taxes levied on the Shopping Center based on the ratio of the floor area of the Leased Premises to the floor area of all floors of all buildings (including the Leased Premises) existing on the Shopping Center on the applicable assessment dates.

(c)    Lessee may in its own name or in the name of Lessor, contest the validity or amount of any such taxes or the assessments upon which the same are based, and Lessor agrees to render to Lessee all assistance reasonably possible, including joining in and signing any protest or pleading which Lessee may deem advisable.  If any rebate of such taxes is made, the rebate shall belong to Lessee (after deduction for payment of any fees or expenses incurred for any such tax reduction, abatement or rebate), to the extent Lessee has so reimbursed Lessor for the year for which such rebate is made.   If the Shopping Center is subject to a minimum assessment agreement or other agreement that precludes any contest of the amount of real estate taxes, Lessee shall only be obligated to pay its pro rata share of the amount of real estate taxes that would be payable without giving effect to such agreement.  Lessor shall have the right to contest the validity or amount of any such taxes or assessments upon the Shopping Center, and Lessee shall pay as additional rent Lessee's prorata share of any reasonable out of pocket fees incurred by Lessor in the prosecution of such tax matter; provided that if any rebate is made, Lessee shall be reimbursed for its prorata share of such rebate to the extent Lessee has so paid Lessor its prorata share for the year for which such rebate is made.

Section 11.2  Insurance Premiums.  As additional rent, Lessee shall from time to time pay to Lessor an amount equal to the "Premiums" for each "policy year" throughout the term hereof, except that the amount to be paid by Lessee with respect to the "policy year" in which the term begins and ends shall be adjusted pro rata on the basis of the number of days of the term falling within each of said policy years.  "Premiums" shall be deemed a pro rata share of the premiums for the so called "all risk" insurance maintained by Lessor under Section 7.1 above applicable to all the buildings in the Shopping Center based on the ratio of the ground floor of the Leased Premises' floor area to all floors of all buildings in the Shopping Center.  If the base rent abates or is apportioned for any reason, the amounts due pursuant to this Section shall similarly abate or be apportioned.  Notwithstanding anything to the contrary, the total amount payable by Lessee for Premiums for the first lease year of this Lease shall not under any circumstances exceed a total of Four Thousand Seven Hundred Eighty-Five and 25/100 Dollars ($4,785.25).

Section 11.3   Common Area Charge.   Lessee shall pay to Lessor, as additional rent, a proportionate share of the actual out-of-pocket cost incurred by Lessor in performing the maintenance required by Section 5.4 hereof and the actual out-of-pocket cost of procuring the insurance required by Section 9.3 hereof (the "CAM Charges").  The proportionate share shall be based on the ratio of the ground floor area of the Leased Premises to total floor area of all buildings in the Shopping Center.   Such costs shall not include any overhead charges, administrative costs, management fees (except a management fee not to exceed five percent (5%) of CAM Charges, of which Lessee shall pay its proportionate share) or capital expenditures. In the event rent abates or is apportioned, for any reason, the charges provided for in this Section shall also abate or be apportioned.

Notwithstanding anything to the contrary, the total amount payable by Lessee for CAM Charges for the first lease year of this Lease shall not under any circumstances exceed a total of Nine Thousand Five Hundred Seventy and 50/100 ($9,570.50), and that for each lease year thereafter Lessee's prorata share of CAM Charges shall not under any circumstances exceed 105% of Lessee's prorata share of CAM Charges for the immediately preceding lease year.

Section 11.3   Monthly Installments.  Lessee shall pay Lessor monthly, together with Lessee's payment of base rent, 1/12th of Lessor's estimate of Lessee's annual liability under this Article for Taxes, Premiums and CAM Charges.  Lessor's estimate of Lessee's annual liability under this Article shall be prepared and delivered to Lessee at the beginning of each calendar year and shall be based upon the amounts budgeted by Lessor for Taxes, Premiums and CAM Charges.

Within ninety (90) days after the end of each calendar year, Lessor shall provide to Lessee an itemized statement in reasonable detail showing the Taxes, Premiums and CAM Charges that were actually incurred by Lessor for said calendar year and the amount chargeable to Lessee, including the basis of computation.  The itemized statement shall be subject to verification by Lessee, including the right to request additional evidence reasonably satisfactory to Lessee in order to substantiate such Taxes, Premiums and CAM Charges. If Lessee has overpaid Taxes, Premiums or CAM Charges, then Lessee shall credit such amount of overpayment against the next monthly rental payment then due by reducing such rental payment accordingly, except if during the last year of the term of this Lease, then Lessor shall reimburse the overpayment amount within thirty (30) days.  If Lessee has underpaid Taxes, Premiums or CAM Charges, Lessee shall pay the balance owed to Lessor within thirty (30) days after Lessee's receipt of the itemized statement and verification by Lessee as to the amount due and the payment of such Taxes, Premiums and CAM Charges.

Lessor agrees to maintain copies of all contracts, invoices, canceled checks and other documentation reasonably required to support the billings for Taxes, Premiums and CAM Charges and, upon request made by Lessee within two (2) years after the conclusion of the applicable calendar year, to make such records and documentation available for audit by Lessee at Lessor's principal office during normal business hours and on a date mutually acceptable to both parties.  If such audit discloses any error in the determination of Taxes, Premiums or CAM Charges, or in calculating Lessee's proportionate share thereof, Lessor shall refund to Lessee any overcharge or bill Lessee for any undercharge within 30 days of receipt of notice of the necessary adjustment from Lessee.  The cost of such audit shall be paid by Lessee, unless Lessee shall be entitled to a refund in excess of five (5) percent of the amount calculated by Lessor, in which case Lessor shall reimburse Lessee for the costs of such audit, not to exceed $5,000.00 (whether such audit was performed by Lessee or by a third party).

## ARTICLE 12. HAZARDOUS WASTE

Section 12.1   Hazardous Material.  As used herein, the term "Hazardous Material" means petroleum products, asbestos, tetrachloroethylene; polychlorinated benzyls; polychlorinated biphenyls; nuclear waste, underground storage tanks and any other hazardous or toxic substance, material or waste, which is or becomes regulated by any applicable federal, state or local laws, rules or regulations pertaining to any materials deemed to be hazardous (collectively "Environmental Laws"), whether originating from the Leased Premises or the Shopping Center, or migrating, flowing, percolating, defusing or in any way moving onto or under the Leased Premises or the Shopping Center.

Section 12.2   Lessee's Activity.  Lessee shall not engage in any activity on or about the Leased Premises that violates any Environmental Laws.  Lessee shall promptly, at Lessee's expense, take all investigative and/or remedial action required or ordered by any governmental unit or agency as to any contamination of the Leased Premises or the Shopping Center created by Lessee that violates any applicable Environmental Law.  Lessee shall indemnify and hold Lessor, its agents, employees, lenders, ground tenant, if any, and the Leased Premises and Shopping Center harmless from any and all costs, claims, expenses, penalties and attorneys' fees arising out of a breach by Lessee of its covenants in this Section 12.2, including but not limited to, the investigation, remediation and/or abatement of any contamination therein involved.

Section 12.3   Lessor's Responsibilities.  Lessor and Lessee agree as follows with respect to the existence or use of Hazardous Material on the Leased Premises or in the Shopping Center:

Lessor hereby represents, warrants and covenants to Lessee that, to its best knowledge,

(i)  The Leased Premises and the Shopping Center are, as of the commencement of the term, (A) in compliance with all applicable Environmental Laws; and (B) free of any Hazardous Material in, on or under the Shopping Center except for those that are commonly used in Shopping Center facilities and in reasonable amounts.

(ii)  Lessor shall be responsible for all costs (which costs shall not be included in Common Area Maintenance Cost) incurred in complying with any order, ruling or other requirement of any court or governmental body or agency having jurisdiction over the Shopping Center requiring Lessor to comply with any Environmental Laws in, on or about the Shopping Center and the Leased Premises including, without limitation, the cost of any required or necessary repair, cleanup or detoxification in the preparation of any closure or other required plans, excluding however, any such cost relating to Hazardous Material on the Leased Premises established to have been caused directly by Lessee's use of the Leased Premises.

(iii)  To the extent commercially practical, Lessor shall take such action as is necessary to enforce the requirements contained in any leases or occupancy agreements with other tenants or occupants in the Shopping Center which relate to the handling, transportation, storage, treatment, use or disposition of Hazardous Material by such other tenants or occupants.

(iv)  Lessor shall indemnify, defend and hold Lessee, its directors, officers, employees and agents and any successor to Lessee's interest in the Leased Premises harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys' fees, consultant fees

and expert fees) caused by, arising out of or related to (A) the breach of any representation, warranty or covenant of Lessor contained herein or (B) Hazardous Material in, or about the Shopping Center, or the Leased Premises other than Hazardous Material established to have been caused directly by Lessee's use of the Leased Premises, or (C) any such Hazardous Material with respect to which any court or governmental body or agency having jurisdiction over the Shopping Center holds Lessor responsible for or otherwise requires Lessor to undertake any repair, cleanup, detoxification or other remedial action, excluding, however, Hazardous Material on the Leased Premises established to have been caused directly by Lessee's use of the Leased Premises.

Section 12.4   Interference with Business.  In the event any Hazardous Material shall be present in, on or under the Shopping Center or the Leased Premises at any time during the term hereof, other than Hazardous Material established to have been caused directly by Lessee's use of the Leased Premises, and such presence or the cleanup, removal, repair, detoxification or other remedial action with respect to such Hazardous Material interferes with the conduct of Lessee's business on the Leased Premises, all rental payable by Lessee under this Lease shall be reduced for the duration of such interference based on the extent of such interference; provided, however, if such interference is material and interferes, or reasonably appears that it will interfere, with Lessee's use of the Leased Premises for at least a one hundred eighty (180) day period, Lessee shall have the right to terminate this Lease by written notice to Lessor.

## ARTICLE 13. GENERAL

Section 13.1   Default.

(a)      If any rent is due and remains unpaid for ten (10) days after receipt of written notice from Lessor, or if Lessee breaches any of the other covenants of this Lease, and if such other breach continues for thirty (30) days after receipt of written notice from Lessor, or in the event Lessee shall file a petition in bankruptcy or arrangement, or be adjudicated a bankrupt, or make an assignment for the benefit of creditors, or take advantage of any insolvency act, same shall constitute an Event of Default and Lessor shall then, but not until then, have any and all rights and remedies available to it at law or in equity, including, but not limited to:

(i)      the right to sue for rent and other damages as it accrues pursuant to the terms of this Lease;

(ii)      the right, but not the obligation, to pay all sums and take all actions that are necessary or desirable to perform Lessee's obligation, and Lessee will reimburse Lessor for such reasonable sums and other reasonable costs incurred by Lessor as additional rent within thirty (30) days after demand therefore.  The performance by Lessor of one of Lessee's obligations will not be construed as a modification or waiver of any provision of this Lease, and such obligation will remain the obligation of Lessee;

(iii)      the right to declare the Lessee's right to possession terminated, re-enter the Leased Premises, remove Lessee's property from the Leased Premises and store it for Lessee's account and at Lessee's expense, eject all persons from the Leased Premises and relet the Leased Premises, in which event Lessee shall continue to be liable for all of the Lessee's obligations under this Lease, as and when such obligations come due under the terms of this Lease, for the remainder of the current term of this Lease, provided that any amount received by Lessor from any reletting of the Leased Premises,

after deduction of reasonable expenses incurred by Lessor for such reletting, shall be credited against Lessee's obligations; or

(iv)     the right to terminate this Lease by written notice to Lessee. In the event Lessor elects to terminate this Lease in accordance with the foregoing, Lessor may recover as damages from Lessee the unpaid rental and other amounts due hereunder which accrued prior to the effective date of such termination of the Lease and the present value of the excess, if any, of (i) the base rent and additional rent due under the terms of this Lease for the remainder of the then current term of this Lease, over (ii) the reasonable rental value of the Leased Premises for the remainder of the then current term of this Lease. The present value of such excess, if any, shall be determined by discounting such excess using a discount rate equal to the then current prime rate of interest announced by Bank of America NA, or its successor, as its prime rate for unsecured loans, regardless of what rate such bank actually charges its customers.

Notwithstanding the foregoing, if Lessee shall in good faith within said thirty (30) days commence to correct such non-monetary breach and diligently proceed therewith, then Lessor shall not have the right to exercise any remedies. Lessor shall be obligated to exercise reasonable efforts to mitigate any damages it may incur as a result of Lessee's default under this Lease. All rights and remedies provided for herein or otherwise existing at law or in equity are cumulative, and the exercise of one or more rights or remedies by Lessor shall not preclude or waive its right to the exercise of any or all of the others.

(b)     If Lessor breaches any of its covenants under this Lease, fails to make any required alteration or repair required to be made by Lessor under this Lease and such breach continues for thirty (30) days after receipt of written notice from Lessee (except that in case of emergency prior notice need not be given), then Lessee shall have any and all rights and remedies available to it at law or in equity and additionally may perform Lessor's obligations. Lessor shall, within ten (10) days after written demand, pay to Lessee the amount incurred by Lessee in performing Lessor's obligations under this Lease. If Lessor fails to pay, Lessee may deduct said amount from the rents and other charges due under this Lease.

Section 13.2     Legal Fees. In the event of legal action between Lessor and Lessee on account of any alleged breach or default by either under this Lease, the prevailing party in such action shall be entitled to be reimbursed by the other party in the amount of all reasonable attorneys' fees and other costs incurred by the prevailing party in connection with such action.

Section 13.3     Notices. Notices and demands required or permitted to be given under this Lease shall be given by registered or certified mail and shall be addressed:

If to Lessor:                    Jefferson City Commons, LLC
                                 48 East Old Country, #203
                                 Mineola, NY 11501

or, at the last address at which rent is payable, and

If to Lessee:                    Moran Foods, Inc.
                                 Attn: Asset Management Group
                                 100 Corporate Office Drive
                                 Earth City, Missouri 63045

With an additional copy to:   Moran Foods, Inc.
                              Attn: Legal Department
                              100 Corporate Office Drive
                              Earth City, Missouri 63045

or at such other address as Lessee shall designate by written notice to Lessor.  Notices and demands shall be deemed to have been given when mailed.

Section 13.4   Rent Refund.  Promptly after the termination or cancellation of this Lease for any reason or after the effective date of the abatement of rents and other charges under this Lease, whether entire or partial, Lessor shall refund to Lessee all rents and other charges paid by Lessee to the extent they are allocable to any period of time beyond the effective date of such termination, cancellation or abatement of rent and other charges.

Section 13.5   Holding Over.  Subject to the rights of Lessee pursuant to Sections 6.8 and 6.10 hereof, Lessee shall at the termination of this Lease by lapse of time or otherwise yield up immediate possession of the Leased Premises; if it does not do so, Lessee shall pay as liquidated damages for the time such possession is withheld a sum equal to two (2) times the rent prorated on a daily basis.  In no event shall such holding be deemed to create a tenancy from year to year, nor shall Lessor elect to create such a tenancy.  Lessor may immediately bring an action to terminate said holdover tenancy.

Section 13.6   Commissions.  Each party represents and warrants that it has not dealt with any real estate broker or agent in connection with this Lease and agrees to defend, indemnify and save the other party harmless of and from any and all claims for brokerage fees and commissions, which result from a breach of the foregoing representation.

Section 13.7   Waiver.  The failure of Lessor or Lessee to insist upon strict performance by the other of any of the provisions of this Lease or to exercise any option herein conferred shall not be deemed as a waiver or relinquishment for the future of any such provision or option.

Section 13.8   Remedies.  All rights and remedies provided for herein or otherwise existing at law or in equity are cumulative, and the exercise of one or more rights or remedies by either party shall not preclude or waive its right to the exercise of any or all of the others.

Section 13.9   No Offer.  The submission of this Lease for examination does not constitute an offer to enter into a lease, and this Lease shall become effective only upon execution and delivery hereof by Lessor and Lessee.

Section 13.10   Interpretation.  All provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each section hereof.  The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one lessor or lessee and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.  The captions of the articles and sections contained herein are for convenience only and do not define, limit, construe or describe the scope or intent of such articles or sections.  If any provision of this Lease shall be held invalid, the validity of the remainder of this Lease shall not be affected thereby.

Section 13.11   Exhibits and Entire Agreement.  All exhibits referred to in and attached to this Lease are hereby made a part of this Lease. This Lease and the Exhibits attached hereto

reflects the entire agreement of the parties concerning the Shopping Center, and no representations, inducements or agreements, whether oral or otherwise, between the parties not contained in this Lease shall be of any force or effect.

Section 13.12  Successors.  This Lease shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns, and the covenants, agreements, conditions and undertakings in this Lease shall be construed as covenants running with the land. No third party, other than such heirs, legal representatives, successors and assigns, shall be entitled to enforce any or all of the provisions of this Lease or shall have any rights under this Lease whatsoever.

## ARTICLE 14. CONTINGENCIES

Section 14.1  Lessee's Title Examination Contingency.  Lessor shall deliver to Lessee upon execution of this Lease, copies of any title policies or commitments it has in its possession regarding the Shopping Center.  Lessee may obtain, at its own expense, such additional title evidence regarding the Shopping Center as it desires.  Within thirty (30) days of the date hereof, Lessee may provide Lessor written notice of any title defect that interferes with the Lessee's rights under this Lease.  If Lessor does not resolve the title defect within thirty (30) days of the written notice, Lessee may terminate this Lease by written notice to Lessor.

Section 14.2  Lessee's Environmental Contingency.  Lessor shall deliver to Lessee upon execution of this Lease, copies of any reports of environmental assessments it has in its possession regarding the demised Premises.  Lessee may obtain, at its own expense, such additional environmental investigations of the Shopping Center it desires, including physical inspections.  If Lessee is not satisfied with the environmental condition of the demised Premises, in its sole discretion, Lessee may terminate this Lease by written notice to Lessor within thirty (30) days of the date of execution of this Lease.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have executed and affixed their respective seals to this Lease as of the day and year first above written.

LESSOR

JEFFERSON CITY COMMONS, LLC,
a Texas limited liability company

By: _____

Name: _____M. Malekan_____

Title: _____Member_____

Federal Tax Identification No.:_____


Attest:_____

Title:_____


Witness:_____

Witness:_____


LESSEE

MORAN FOODS, INC.,
a Missouri corporation

By: _____

Name: ____G. F. Meyer_____

Title: ____Vice President_____


Attest:_____

Title:___Julie Stenger, Assistant Secretary___


Witness:_____

Witness:____Michele Walker_____

## ACKNOWLEDGMENT

STATE OF _____ )
                    ) SS.
COUNTY OF _____ )

On this ____ day of _____, 2007, before me, a Notary Public in and for said County, personally appeared _____, to me personally known, who being by me duly sworn, did say that he/she is _____ of _____ a _____, and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said _____ by it voluntarily executed.

_____
Notary Public

Commission Expiration Date:

M. DAVID BAHR
Notary Public, State of New York
No. 31-4826470
Qualified in New York County
Commission Expires Sept. 30, 20__

STATE OF MISSOURI )
                     ) SS.
COUNTY OF ST. LOUIS )

On this 6th day of July, 2007, before me, a Notary Public in and for said County, personally appeared G. F. Meyer, to me personally known, who being by me duly sworn, did say that he is Vice President of MORAN FOODS, INC., a Missouri corporation, and acknowledged the execution of the foregoing instrument to be the voluntary act and deed of said corporation by it voluntarily executed.

_____
Notary Public

My Commission Expires:

Lynn W. McQuesten
Notary Public
State of Missouri
St. Charles County
My Comm. Exp.: Feb. 4, 2008